EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CARLOS CARRASQUILLO CARRASQUILLO, acusado y apelante.

*Número:* CR-74-6      *Resuelto:* 25 de septiembre de 1974

A. *J. Amadeo Murga,* abogado del acusado; *Peter Ortiz, Procurador General Auxiliar,* y *Adolfo J. Vilá, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

"Me hicieron un rancho." Esta aseveración se oye en no pocas ocasiones como la única explicación del acusado para ser encausado por un delito que alega no haber cometido. Las más de las veces su dicho tropieza, para empezar, con la incredulidad de su propio abogado, luego con la mal disimulada sonrisa burlona del fiscal y, finalmente, con el escepticismo del juez. En el caso ahora ante nos, a eso equivale el planteamiento del apelante. El juez de instancia no le creyó. Nosotros creemos que debió tener una duda razonable y debió absolverle.

El apelante señala la comisión de dos errores. Por el primero ataca la suficiencia de la prueba para establecer su culpabilidad más allá de duda razonable. Por el segundo impugna la corrección de las advertencias héchasle al renunciar a ser juzgado por un jurado. Se cometió el primero y no es necesario, por tanto, considerar el segundo. Veamos los hechos.

El apelante, un joven de 28 años de edad, de oficio albañil, fue acusado de disparar un revólver contra otra persona con intención de causarle grave daño corporal. A base de esas alegaciones se le imputaron los delitos de acometimiento grave e infracción de los Arts. 6 y 8 de la Ley de Armas, 25 L.P.R.A. secs. 416 y 418, respectivamente. Para sostenerlas, el fiscal

presentó dos testigos nombrados Daniel García Adorno y José Luis Castro del Valle.

García Adorno sostuvo que el sábado, 29 de mayo de 1971, a eso de las 12:30 pasado el mediodía, viajaba en un carro público de su residencia en un barrio de Carolina hacia la casa de su suegro en Canóvanas. Frente a una fábrica vio el carro de su suegro que cruzó hacia el Barrio Cedro de Canóvanas y decidió quedarse allí a esperar que su suegro regresara. Ordenó detener el carro en que viajaba y se desmontó.

Estaba parado frente a la fábica cuando llegó Carrasquillo, el apelante, manejando un automóvil y se paró a la derecha. He aquí su testimonio a preguntas del fiscal:

"P. Bajaba en qué?

R. En el carro de él, un carro público.

P. Solo o acompañado?

R. Solo. Entonces, se me echó a reir y yo le pregunté qué le pasaba. Entonces, en vez de seguir en dirección a Canóvanas, jaló el carro para encima de mí y trató de agolpearme. Al ver que yo me le había escapado, yo seguí corriendo. Entonces al el carro quedar así, como metido para la fábrica, pues entonces yo seguí andando, mirándolo a él. En eso, abrió la gaveta y sacó un revólver.

P. Cómo era?

R. Negro, de cañón corto.

P. Y qué hizo él con ese revólver, si hizo algo?

R. Al disparar, al mismo tiempo de disparar, yo me tiré al piso.

P. Y qué hizo entonces Carlos Carrasquillo?

R. Este a lo mejor, me deja por muerto.

P. Diga lo que pasó, lo que usted viera.

R. Al él dispararme, siguió derecho para Canóvanas.

P. Usted dice que ese revólver, ¿cómo era, nuevamente?

R. Era negro de cañón corto.

P. Y por dónde fue que le disparó a usted, por qué parte del carro?

R. De la parte del guía, pero con este brazo.

P. Brazo derecho?

R. Sí."

Declaró más adelante:

"R. Después de él dispararme, que yo me tiré al piso, él se fue y apareció Castro y me levantó del piso. Me preguntó si a mí me habían hecho los disparos. Yo le dije que sí. Me preguntó si estaba herido. Yo le dije que no. Me dio una tarjetita por si acaso yo tenía interés en denunciarlo. Lo conseguí por el número de tablilla del carro y después yo me fui y notifiqué a la Policía."

El examen directo del fiscal terminó cuando el testigo declaró que el apelante le disparó porque él, García Adorno, fue testigo en su contra en un caso de asesinato seguido contra el apelante y otras personas, que había terminado el día antes— 28 de mayo de 1971—con la absolución del apelante. Declaró:

"R. El me dijo a mí que si él salía bien del caso, dondequiera que me encontrara me iba a matar."

El otro testigo, Castro del Valle, corroboró prácticamente en todos sus extremos, sin faltar apenas un detalle, la declaración de García Adorno. Dijo que conducía su automóvil de Canóvanas hacia Campo Rico cuando vio "un carro color colorado de cuatro puertas, que de la izquierda tiró a la derecha, de la izquierda donde él estaba parqueado tiró a la derecha," vio un señor parado que luego identificó como Daniel Adorno, y "trató de impactarlo [sic]". "Entonces, cuando enderezó el vehículo hacia la derecha, se detuvo y le hizo un disparo con la mano derecha al señor Adorno." Vio "un revólver corto, negro." Detuvo su carro y fue a auxiliar a García Adorno dándole una tarjeta con el número de la tablilla de su carro y su teléfono para que "si en algo le podía servir, que me llamara." A renglón seguido y sin que se le preguntara expresó: "Entonces el Sr. Carlos iba solo en el carro, no iba nadie." También adelantó, sin ser preguntado, que en la fábrica no había nadie. Dijo que no conocía a García Adorno. Respecto del apelante dijo que "lo había visto" y comentó: "Yo soy Carrasquillo también de apellido. A lo mejor es familia mía."

■ Hasta aquí, podría decirse que no hay razón para justificar nuestro introito. Veamos, sin embargo, cómo se producen las coincidencias que abundan en las que los testimonios reseñados ya han dejado entrever, y cómo en justicia tiene que señalarse la existencia de una duda, razonable y fundada, sobre la culpabilidad del apelante. Es el producto de una bien planificada repregunta, hecha seguramente, por su estilo, sin estridencias, incisiva sin caer en el vicio de la expedición de pesca, que no es timbre del arte de repreguntar.

Revelan los contrainterrogatorios de García Adorno y de Castro del Valle lo siguiente: Aunque García Adorno declaró el día del juicio de este caso—21 de diciembre de 1971—que conocía al apelante hacía "siete u ocho meses", lo cierto es que había sido testigo en su contra en el caso de asesinato ventilado en mayo de ese año—precisamente ocho meses atrás— por hechos que debieron haber ocurrido muchos meses y quizás más de un año antes. También había habido otra imputación de García Adorno por hechos similares a éstos ante nos y por los cuales se absolvió al aquí apelante. El alegado occiso en el caso de la acusación de asesinato de que el apelante fue absuelto no le era desconocido a García Adorno. De hecho, la viuda del occiso era su parienta, sobrina de su padrastro. Los hermanos del occiso lo llevaron al tribunal para la vista del caso de autos, y permanecían allí pendientes de su resultado. ¿Por qué? Parece que el propio fiscal acusador tuvo dudas de la veracidad de este testigo porque, si el apelante lo amenazó con matarlo y al otro día le hizo un disparo con un arma de fuego, ¿por qué lo acusó de un mero acometimiento (delito menos grave) y ·o de ataque para cometer asesinato?

Castro del Valle, quien dijo no conocer a García Adorno, estuvo presente durante la vista del caso por asesinato, en que García Adorno fue testigo. Por coincidencia, Castro del Valle también estaba emparentado con el interfecto en dicho caso. Era su primo segundo. Por coincidencia, no empece residir en Río Piedras, tuvo que ir a Canóvanas el sábado 29 de

mayo de 1971. Coincidencia aún mayor es que se encontrara a las 12:30 pasado el mediodía, precisamente en el lugar y para presenciar el incidente que motivó las acusaciones que en este caso nos ocupan.

Es dudoso que yendo en un carro en movimiento, presumimos que provisto del correspondiente cristal parabrisas, viera, mientras los carros se acercaran de 200 a 50 pies, a través de su parabrisas y del parabrisas del carro que dice él que conducía el apelante, que éste tenía un revólver negro, de cañón corto, en su mano derecha. Si vio que el apelante disparó contra García Adorno y ayudó a éste a levantarse del piso, ¿por qué preguntarle a García Adorno si a él le habían hecho los disparos? ¿Y por qué darle una tarjeta con el número de licencia de su carro y su teléfono en vez de llevarlo al cuartel de policía más cercano? ¿Por qué aprontar testimonio que no le era preguntado?

Los únicos testigos desinteresados en este caso los produjo la defensa. Eran dos guardias de seguridad de la fábrica a que se refirieron García Adorno y Castro del Valle. Ambos prestaban servicio de vigilancia en una caseta a 10 yardas (30 pies) de la carretera en que según la prueba de cargo ocurrieron los hechos imputados al apelante. Desde allí tenían plena visibilidad de aquel lugar. El primero rindió su servicio a las 12:10 en que fue relevado por el segundo, que continuó hasta las ocho de la noche. Ninguno vio el alegado incidente. Ninguno oyó el alegado disparo.

El apelante no debe ser un violador de la ley si consideramos que luego del fallo condenatorio fue merecedor de los beneficios de una sentencia suspendida.([1]) Si fuera inconcebible la formación del "rancho", igualmente inconcebible sería

---

([1]) La Ley Núm. 259 de 3 de abril de 1946, según enmendada, que instituyó el sistema de libertad a prueba, mediante la suspensión de la sentencia dispone que deben concurrir al tiempo de imponer sentencia los siguientes requisitos en la persona sentenciada: "(1) que dicha persona, con anterioridad a la fecha en que se intente suspender la sentencia dictada, no hubiere sido convicta, sentenciada y recluida en prisión por delito grave alguno con

que una persona de las condiciones del apelante se armara de un revólver al día siguiente de haber sido absuelto y que en una vía pública, a las 12:30 del día, frente a un automóvil que transitaba en dirección contraria a la suya y a 50 pies de él le entrara a tiros a otro porque hubiera sido testigo en su contra.

■ Hemos dicho en repetidas ocasiones que los juzgadores de hechos nos merecen respeto y confiabilidad en la apreciación imparcial de la prueba. *Pueblo* v. *Rosario Cintrón*, 102 D.P.R. 82 (1974); *Pueblo* v. *Nevárez Virella*, 101 D.P.R. 11 (1973); *Pueblo* v. *Rodríguez Hernández*, 91 D.P.R. 183, 203 (1964). Con ello no podemos significar que los juzgadores de hechos no se equivoquen. De ahí en que en muchos casos no hemos vacilado en dejar sin efecto un fallo condenatorio cuando un análisis de la prueba que tuvo ante sí el tribunal sentenciador nos deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado. *Pueblo* v. *Meléndez Rolón*, 100 D.P.R. 734 (1972); *Pueblo* v. *Rivera Arroyo*, 100 D.P.R. 46 (1971); *Pueblo* v. *Torres Rolón*, 99 D.P.R. 970 (1971); *Pueblo* v. *Rodríguez González*, 99 D.P.R. 904 (1971); *Pueblo* v. *Bonilla Medina*, 99 D.P.R. 128 (1970); *Pueblo* v. *Cruz*, 58 D.P.R. 33 (1941); *Pueblo* v. *Viana*, 41 D.P.R. 413 (1930).

Hasta tanto se disponga de un método infalible para averi-

anterioridad a la comisión del delito por el cual fuere procesada; y a la cual no se hubiere suspendido los efectos de una sentencia anterior por delito grave; (2) que las circunstancias en que se cometió el delito no evidencian que existe en el autor del mismo un problema de conducta o de carácter para cuya solución favorable, en interés de la debida protección de la comunidad, se requiera la reclusión de dicha persona en alguna de las instituciones penales de Puerto Rico; (3) que el juez sentenciador tenga ante sí un informe que le haya sido rendido por un Oficial Probatorio después de este último haber practicado una investigación minuciosa de los antecedentes de familia e historial social de la persona sentenciada, y que, del contenido de ese informe, pueda dicho juez sentenciador concluir que ningún aspecto de la vida de esa persona evidencia que haya necesidad de que se le recluya en alguna de las instituciones penales de Puerto Rico para que se logre la reforma o rehabilitación que para ella persigue la ley como medida de protección adecuada a la comunidad." 34 L.P.R.A. sec. 1027.

guar sin lugar a dudas dónde está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. Nosotros también tenemos derecho a tenerla tranquila.

■ Cuando de aquilatar la prueba se trata es difícil a veces trazar una línea demarcadora entre cuestiones de hechos y cuestiones de derecho. Las pruebas son hechos pero su análisis pone en movimiento, además de la experiencia del juzgador, su conocimiento del Derecho para así llegar a una solución justa de la controversia. Ese proceso analítico tiene que estar enmarcado en casos penales en el principio fundamental de que la culpabilidad del acusado debe ser probada más allá de duda razonable. Esa prueba, además de suficiente, tiene que ser satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación. Véase el estatuto sobre Derecho probatorio, 32 L.P.R.A. sec. 1633. La determinación de si se ha probado la culpabilidad más allá de duda razonable es pues revisable como cuestión de Derecho. Así lo reconocimos en *Pueblo v. Serrano Nieves*, 93 D.P.R. 56, 60 (1966) donde dijimos:

"No cumpliríamos con nuestro deber si estando plenamente convencidos de que la prueba en determinado caso no establece la culpabilidad más allá de duda razonable, permitiéramos que prevaleciera una sentencia condenatoria. Cuando ello ocurre no se trata de una intervención con la función del juez o del jurado en la apreciación de la prueba, sino de un error de derecho. En el presente caso no se trata de dirimir un conflicto en la prueba, pues sólo desfiló la de cargo, sino simplemente si el contenido de la presentada hace surgir una duda razonable sobre la responsabilidad del acusado."

*Se revocarán las sentencias apeladas y se absolverá al acusado apelante.*