Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| **EL PUEBLO DE PUERTO RICO**<br><br>Apelado<br><br>v.<br><br>**NEFTALI ORTIZ COLON**<br><br>Apelante | KLAN202201042 | **APELACION**<br>Procedente del Tribunal de Primera Instancia, Sala Superior de Aibonito<br><br>Caso Núm.:<br>**B VI2018G0009**<br>**B LA2018G0087**<br>**B LA2018G0088**<br><br>Sobre:<br>**Art. 93 (A) del C.P.**<br>**Art. 5.04 L.A. (2000)**<br>**y Art. 5.15 L.A. (2000)** |
|---|---|---|

Panel integrado por su presidente el Juez Rodríguez Casillas, el Juez Pagán Ocasio y el Juez Pérez Ocasio.

Pérez Ocasio, Juez Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 10 de octubre de 2024.

Comparece ante nos, Neftalí Ortiz Colón, en adelante, Ortiz Colón, o apelante, solicitando que revoquemos la *"Sentencia"* impuesta en su contra, el 22 de noviembre de 2022, por el Tribunal de Primera Instancia, Sala Superior de Aibonito, en adelante, TPI-Aibonito. En la misma, el Foro Apelado declaró culpable a Ortiz Colón por el delito de Asesinato y por dos infracciones a la Ley de Armas de Puerto Rico.

Por los fundamentos que expondremos a continuación, *confirmamos* el dictamen apelado.

**I.**

Por hechos acaecidos el 9 de abril de 2017, se presentaron varias denuncias contra el apelante, el día 30 de julio de 2018.[1] Ortiz Colón fue imputado de los siguientes tres (3) cargos: (1) delito de

---

[1] Los hechos esbozados en la primera parte de esta sentencia son extraídos de los autos originales que obran en nuestro expediente, los cuales recibimos el día 6 de septiembre de 2023.

Número Identificador
SEN2024_____

Asesinato en Primer Grado;[2] (2) delito de portar un arma de fuego sin tener licencia para la misma y (3) por apuntar y disparar ilegalmente un arma de fuego.[3]

Luego de la celebración de la Regla 6 de Procedimiento Criminal, 34 LPRA Ap. II, R. 6, entre otras vistas de conferencias de estatus, Ortiz Colón *renunció a su derecho a la celebración de juicio por jurado*, el 24 de julio de 2019. En el documento sobre la renuncia, surge que el apelante tenía conocimiento de que al renunciar al referido derecho, el Ministerio Público, aquí parte apelada o apelado, solo estaría obligado a "convencer a una persona, el (la) Juez(a) de [su] culpabilidad más allá de duda razonable".[4]

En el interín de los procesos judiciales de rigor, la Corte Suprema de los Estados Unidos de América resolvió el caso de *Ramos v. Louisiana*, 590 US 83 (2020). En su opinión, el más Alto Foro Federal resolvió que la Sexta Enmienda de la Constitución de los Estados Unidos de América requiere que los jurados lleguen a un consenso unánime, para poder encontrar culpable a un acusado de delito. Poco después, nuestro Tribunal Supremo se expresó en el caso de *Pueblo v. Torres Rivera II*, 204 DPR 288 (2020), y *ratificó* lo resuelto en el precitado caso, para la jurisdicción de Puerto Rico.

Amparado en ello, y transcurrido poco más de un (1) año, el 2 de septiembre de 2020, el apelante presentó una *"Moción en Solicitud de Juicio por Jurado"* ante el TPI-Aibonito. El 10 de septiembre de 2020, el Foro Apelado le concedió al Ministerio Público un término de diez (10) días para exponer su opinión. En cumplimiento de orden, el 5 de octubre de 2020, el apelado presentó su oposición a la solicitud de Ortiz Colón.

---

[2] Código Penal de Puerto Rico, Ley 146-2012, 33 LPRA sec. 5142.
[3] Ley de Armas de Puerto Rico, Ley 404-2000, 25 LPRA ant. secs. 458c & 458n.
[4] Autos Originales del caso BLA2018G0087-89, Tomo I.

El 30 de octubre de 2020, el Foro Apelado emitió una *"Resolución"* en la que declaró "No Ha Lugar" la solicitud para reinstalar el jurado del apelante. El 17 de noviembre de 2020, este último presentó una *"Moción de Reconsideración"*, la cual fue declarada "No Ha Lugar" el 30 de noviembre de 2020.

Inconforme, Ortiz Colón presentó una *"Moción Urgente Solicitando Remedios en Auxilio de Jurisdicción"* ante este Foro Apelativo, el 4 de enero de 2021. El 12 de enero de 2021, esta Curia declaró la misma "No Ha Lugar", y mantuvo en efecto la celebración del Juicio en su Fondo. Inconforme con la denegatoria del auxilio, el apelante recurrió ante el Tribunal Supremo de Puerto Rico mediante un recurso de *"Certiorari Criminal"*, quien denegó el mismo.[5] Al próximo día, el 22 de enero de 2021, el Tribunal de Apelaciones emitió una *"Resolución"* en la que denegó expedir el auto de *certiorari*.[6]

Finalmente, el juicio fue celebrado los días 25, 26 y 27 de enero de 2021; 1, 2 y 3 de febrero de 2021; 7,12, 19 y 26 de abril de 2021; 22 de junio de 2021; 8 y 16 de noviembre de 2022; 18 de enero de 2022; 1, 8, 15 y 22 de febrero de 2022; 7 y 17 de junio de 2022. A continuación, ofrecemos un resumen de los testimonios vertidos en el juicio que nos ocupa, y que hemos examinado con detenimiento:

**Agente Alvelo Santiago**

Alvelo Santiago fue agente del Negociado de la Policía desde el año 2003. Con relación al caso de marras, investigó, recopiló información de testigos y custodió la escena. El 9 de abril de 2017 comenzó su turno de servicio a las 8:00 pm, en el Cuartel de la Policía del Municipio de Barranquitas. Testificó que ese día se

---

[5] *Pueblo v. Ortiz Colón*, 206 DPR 97 (2021).
[6] KLCE20210002.

encontraba dando una ronda preventiva cuando recibió una llamada por radio, con relación a un incidente en el Barrio Helechal del Municipio de Barranquitas, en la Carretera 558, Kilometro 0.7.[7]

El agente describió físicamente y con gran detalle el lugar en la mencionada carretera, en donde intervino. Explicó que allí había un poste con suficiente iluminación, y en una casa más adelante, identificó el lugar donde encontraron al occiso. El agente explicó que en la escena había una dama con un joven en sus manos, a la orilla de la carretera, pidiendo ayuda para llevar a su hijo al hospital. Indicó que esta observación la hizo a menos de un kilómetro de distancia. Además, describió al joven herido como delgado, trigueño, sin camisa, vestía un pantalón corto azul, tenía tatuajes en la pierna izquierda, y estaba boca arriba en los brazos de la dama.[8]

Testificó, también, que observó el área hasta donde había evidencia, para acordonarla con cinta amarilla, ya que, por los impactos de bala, entendía que el evento se trataba de un asesinato. Allí estuvo protegiendo la escena hasta que llegó el Agente Nelson Fortis Pérez de la División de Homicidios, quien procedió a tomar las riendas de la investigación del caso.[9]

Durante el contrainterrogatorio, el Agente Alvelo Santiago indicó que no entrevistó a la dama que estaba en la escena de los hechos, ni al hermano de la víctima. Esto, ya que se encontraban en un estado emocional que no lo permitía. Sin embargo, les indicó a ambos que se quedaran en el lugar, hasta que llegaran los agentes investigadores.[10]

### Agente Jorge Torres Torres

Torres Torres indicó ser agente de la policía hace veinte (20) años aproximadamente. Indicó que lo que recopila en una escena lo

---

[7] Transcripción de la prueba oral, pág. 15.
[8] *Id.* págs. 18-21.
[9] *Id.* págs. 21-24.
[10] *Id.* págs. 47-48.

documenta en un informe. Testificó que el 9 de abril de 2017, fue notificado de una escena de asesinato, en el Barrio Helechal del Municipio de Barranquitas.[11] Indicó que llegó al lugar en la madrugada del 10 de abril de 2017. Allí, entrevistó al Agente Alvelo, observó el perímetro de la escena, las piezas de evidencia y la iluminación del lugar. Puntualizó que el Agente encargado de la investigación era Fortis Pérez y la fiscal de turno.[12]

El agente describió su labor en la escena y la evidencia levantada en ella. Alegó que toda esa evidencia fue sometida al Instituto de Ciencias Forenses.

### Dra. Irma Rivera Díez

La doctora es patóloga del Instituto de Ciencias Forenses desde el año 2000, con subespecialidad en patología forense. Declaró que fue la patóloga que realizó la autopsia de la víctima en este caso, el 14 de abril de 2017. Indicó que realizó un informe médico forense. Durante el directo, describió el cadáver que recibió en el Instituto.[13]

### Agente Julio Colón

El testimonio de este agente fue estipulado a los efectos de certificar que, de acuerdo con el Registro de Armas, el acusado no tiene armas de fuego inscritas a su nombre, ni licencia de portación de armas de fuego.[14]

### Minelly Hernández Huertas

Hernández Huertas labora como Examinadora de Armas de fuego del Instituto de Ciencias Forense.[15] En su testimonio, describió las características de los proyectiles analizados, su calibre,

---

[11] Transcripción de la prueba oral, págs. 79-80.
[12] *Id.* págs. 82-84.
[13] *Id.* págs. 295-298.
[14] *Id.* pág. 537.
[15] *Id.* pág. 547.

la comparación microscópica hecha, entre otras cosas. Concluyó que los proyectiles analizados, relevantes al caso de autos, provinieron de la misma arma de fuego.[16]

### Fiscal Nanette Benítez

Se estipuló la orden de registro y allanamiento dirigida a una cuenta de la red social Facebook. Se estipuló la declaración jurada del Agente Fortis Pérez, que dio lugar al allanamiento y el diligenciamiento con la firma del magistrado.[17]

### Agente José Díaz Santana

Díaz Santana testificó ser parte de la Policía de Puerto Rico por veintitrés (23) años. Desde el 2012, el agente pertenece al Cuerpo de Investigaciones Criminales de Aibonito.[18] En su testimonio, indicó que el 9 de abril de 2017 se encontraba en su residencia, cerca del lugar de los hechos, cuando escuchó varias detonaciones. Alegó que minutos después de esto, recibió una llamada de su supervisor para informarle que en el Barrio Helechal del Municipio de Barranquitas habían asesinado a un joven.[19]

Cuando el agente llegó a la escena, se mantuvo entre las personas del perímetro acordonado. Indicó que los balcones de las residencias alrededor de la escena tenían sus luces encendidas y esa iluminación daba hacia la carretera. Expresó que observó a una dama gritando que habían asesinado a su esposo y que había sido un tal 'Nefti'. Además, vio a la madre del occiso, la cual conocía, y en ese momento estaba gritando.[20]

Estando aún allí, el Agente Díaz Santana le indicó al Agente Fortis Pérez lo que había escuchado de la esposa del occiso, en el lugar de la escena. El Agente Fortis Pérez le solicitó que buscara la

---

[16] Transcripción de la prueba oral, págs. 570-571.
[17] *Id.* pág. 590-591.
[18] *Id.* pág. 602.
[19] *Id.* pág. 607-608.
[20] *Id.* pág. 612-614.

información de Neftalí Colón por Facebook, lo cual hizo el 4 de junio de 2018. Testificó que al entrar a la cuenta observó dos (2) fotos del acusado parado al lado de un auto Toyota Corolla, color guayaba. Indicó que le suministró esta información al Agente Fortis Pérez, quien estaba a su lado durante la búsqueda.[21]

### Legna Liz Colón Berrios

Colón Berrios fue la compañera consensual del occiso, pero al momento de los hechos ya no convivían como pareja. Testificó que el 9 de abril de 2017, el occiso vivía con su madre. Durante su testimonio, Colón Berrios identificó una foto del vehículo de un tal 'Puchín'.[22] Indicó que la última vez que vio a la víctima con vida fue ese mismo día, en su casa, poco después del mediodía. Expresó que cuando este se iba de su casa, lo escuchó hablando con coraje, nervioso y en voz alta. Añadió que en esa conversación mencionó a 'Nefti', quien alegadamente lo amenazaba de muerte. Además, relató que conoció a 'Nefti' en una fiesta hacían unos meses.[23]

El 10 de abril de 2017, a las 12:53 am, Colón Berrios, llamó a la víctima, y no recibió respuesta. Por ello, se dirigió al Barrio Helechal, llegando al lugar a la 1:05 am. Allí, se encontró con la escena acordonada. Indicó haber visto a la madre y el hermano del occiso.[24] Testificó que, una vez allí, abrazó a Lescalier, hermano de la víctima, quien le dijo que había visto todo lo ocurrido. Además, indicó que este le dijo que el autor de los hechos había sido un muchacho de baja estatura, 'llenito', con chiva, lucía una gorra y mariconera. Además, ofreció el detalle de haberlo visto en un Corolla color guayaba. Colón Berrios comenzó a decir que había sido 'Nefti',

---

[21] Transcripción de la prueba oral, pág. 626.
[22] *Id.* pág.756-757.
[23] *Id.* págs. 767-774.
[24] *Id.* pág. 775.

ya que era la misma descripción de este. Además, la testigo lo identificó en sala.[25]

En horas más tarde de ese día, se encontraba en casa del occiso, cuando llegó 'Puchín' en su carro Corolla y se estacionó frente a la casa. Alegó Colón Berrios que Lescalier comenzó a gritar que sacaran el carro, ya que este había sido usado por 'Nefti' para matar a su hermano.[26]

Así las cosas, en el mes de octubre de 2017, la testigo decidió hablar con la Policía, e informarles que 'Nefti' fue el que mató a su expareja.[27]

### Sargento Ángel Sánchez Rivera

El Sargento indicó que laboraba para el Cuerpo de Investigaciones Criminales de Aibonito hace treinta y un (31) años.[28] Toda la información recopilada por el Sargento la plasmó en un memorando, y lo dirigió al Director de Homicidios para que fuera canalizado a través del Agente Fortis Pérez, quien tuvo a cargo la investigación del caso. Lescalier le describió la noche de los hechos al Sargento. Además, testificó que Lescalier le describió a la persona que le disparó a su hermano.[29]

El Sargento continuó testificando que el día de los hechos – 9 de abril de 2017 – se encontraba 'on-call'. Así cuando ocurrió el evento delictivo, la Sargento de turno lo llamó, y éste se personó al lugar de los hechos. Indicó que llegó como a la 1:00 am, y que en la escena se encontraban oficiales de Servicios Técnicos, la madre del occiso, la pareja de este y su hermano Lescalier. Sin embargo, indicó que estando allí, estos le indicaron no haber visto nada.

---

[25] Transcripción de la prueba oral, págs. 783-786.
[26] *Id.* págs. 795-797.
[27] *Id.* págs. 800-803.
[28] *Id.* pág. 974.
[29] *Id.* págs. 983-985.

Finalmente, indicó que para el 11 de octubre de 2017 llegó a la oficina luego del mediodía, y recibió instrucciones para entrevistar los familiares del occiso. Alegó que allí se encontraba Colón Berrios, la madre y el hermano del occiso, quienes querían saber el estatus de la investigación. En su entrevista con estos, Lescalier le mencionó al Sargento que el autor del asesinato en cuestión fue 'Nefti', y que 'Puchin' estuvo en la escena.[30]

### Sonia Negrón Ortiz

Negrón Ortiz es la madre del occiso, y vive en el Barrio Helechal hace aproximadamente veintiséis (26) años. La dama relató que el día de los hechos, la víctima llegó a su casa a las 10:30 pm y se fue a su cuarto. Luego de que esta y Lescalier se acostaran a dormir, pasó un rato, antes de que Negrón Ortiz escuchara dos (2) disparos provenientes del frente de su casa. Relató que posterior a estos primeros disparos, escuchó a alguien decir "mami, me mataron".[31] Sin embargo, luego de esto, escuchó varias detonaciones más. Alega Negrón Ortiz que cuando pudo salir, intentó darle primeros auxilios, sin éxito. Además, testificó que estando allí, gritó que 'Nefti' había matado a su hijo.

Finalmente, declaró que en el mes de octubre del año 2017 se entrevistó con el Sargento Sánchez Rivera para saber el estado de la investigación del asesinato de su hijo. Negrón Ortiz aprovechó la visita, para indicarle al Sargento que Lescalier había dicho la verdad, que 'Nefti' fue el que disparó y mató a la víctima.[32]

### Lescalier Rosado Negrón

Para el momento de los hechos, Rosado Negrón, hermano del occiso, tenía diecisiete (17) años. Testificó que en aquel momento

---

[30] Transcripción de la prueba oral, pág. 1344.
[31] *Id.* pág. 1416.
[32] *Id.* págs. 1443-1444.

vivía en la casa de su mama, y la identificó en fotos. Este declaró que la última vez que vio a su hermano fue cuando el acusado lo estaba matando.[33]

Relató que esa noche se acostó a dormir antes de que ocurriera todo, ya que al próximo día tenía clases. Sin embargo, se levantó cuando escuchó el vehículo en donde andaba la víctima, llegar a la casa. Posteriormente, escuchó a su madre hablando con el occiso en la cocina de la casa. Ahora bien, se levantó finalmente cuando escuchó las primeras detonaciones, y a su hermano gritando que lo mataban. Por eso, corrió hacia la ventana de su cuarto, y observó un Toyota Corolla. Alegó que de allí podía ver al acusado, disparándole a la víctima.[34] El testigo identificó al acusado en sala.

Luego, narró que luego de observar el delito, salió y se escondió detrás del auto de su madre. Además, indicó que su mamá salió corriendo de la casa, por lo que tuvo que retenerla físicamente por unos momentos para que no saliera al frente de la casa. Alegó que desde donde se encontraba, podía ver nuevamente al acusado disparándole a su hermano. Luego de que cesaron los disparos, su madre se dirigió hacia el cuerpo de la víctima.[35]

Dijo, además, que luego de todo esto, se fue a la casa de su vecino, hasta que llegó la pareja del occiso. Añadió que luego de relatarle lo ocurrido a ella, esta última le indicó que había sido 'Nefti' quien mató a su hermano.[36]

Finalmente, declaró que tres (3) meses más tarde, le confesó a su madre que había buscado a 'Nefti' en Facebook, y había encontrado una foto de este en el auto Corolla que vio el día de los

---

[33] Transcripción de la prueba oral, págs. 1732-1733.
[34] *Id.* págs. 1732-1733.
[35] *Id.* pág. 1758.
[36] *Id.* págs. 1769-1772.

hechos. Testificó, además, que identificó al acusado en una rueda de fotos con el Agente Fortis Pérez, y en compañía de su madre.[37]

Escuchada y aquilatada la prueba, el 17 de junio de 2022, el TPI-Aibonito encontró a Ortiz Colón culpable de Asesinato en Primer Grado, y por las infracciones imputadas a la Ley de Armas de Puerto Rico, supra. Finalmente, el 22 de noviembre de 2022, el Foro Primario celebró la una vista para dictar sentencia. En total, lo condenó a cumplir ciento sesenta (160) años y seis (6) meses de cárcel. La *"Sentencia"* fue notificada por escrito el 30 de noviembre de 2022.

Así las cosas, el 20 de diciembre de 2022, el apelante recurre ante esta Curia mediante un escrito de "Apelación". En el mismo, hace dos (2) señalamientos de error:

> **PRIMER ERROR:** ERRÓ EL HONORABLE TRIBUNAL DE INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD EN EL CASO DE EPÍGRAFE A PESAR DE QUE NO SE PROBÓ LA CULPABILIDAD DEL ACUSADO MÁS ALLÁ DE DUDA RAZONABLE.

> **SEGUNDO ERROR:** ERRÓ Y ABUSÓ DE SU DISCRECIÓN EL TRIBUNAL DE PRIMERA INSTANCIA AL DECLARAR NO HA LUGAR LA MOCIÓN SOLICITANDO LA CELEBRACIÓN DEL JUICIO POR JURADO PEDIDO POR EL PETICIONARIO POR LA ALEGADA RAZÓN DE QUE SU RENUNCIA FUE HECHA LIBRE Y VOLUNTARIAMENTE, HACIENDO ABSTRACCIÓN DE QUE POSTERIOR A SU RENUNCIA A JUICIO POR JURADO LA FORMA Y MANERA DE SER ENCONTRADO CULPABLE EN UN JUICIO POR JURADO CAMBIÓ SUSTANCIALMENTE CON EL REQUISITO DE UN VEREDICTO UNÁNIME QUE ES MUY DISTINTO A UN VEREDICTO DE MAYORÍA.

Luego de varios trámites para producir la transcripción de la prueba oral del caso, el 31 de agosto de 2023, mediante *"Resolución"*, este Tribunal le concedió un término final de cinco (5) días a la parte apelante para presentar dicha transcripción. El 6 de septiembre de 2023, la apelante presentó la misma.

Mediante *"Resolución"* del 8 de septiembre de 2023, concedimos treinta (30) días al apelante para presentar su alegato. Además, ordenamos al Foro Apelado que elevara los autos originales

---

[37] Transcripción de la prueba oral, págs. 1777-1778.

del caso de epígrafe en diez (10) días. Luego de una breve prórroga, el 23 de octubre de 2023, se presentó ante nos el *"Alegato del Apelante"*. Luego de otra breve prórroga, el 2 de enero de 2024, recibimos el *"Alegato del Pueblo"*.

Perfeccionado el recurso ante nuestra consideración, con el beneficio de los escritos de ambas partes, el examen de los autos originales y la transcripción de toda la prueba oral, nos encontramos en posición para resolver.

## II.

### A. Apelación Criminal

En nuestro ordenamiento jurídico, toda persona acusada tiene derecho a apelar cualquier sentencia penal que recaiga en su contra. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023). Es importante señalar que la apelación es un privilegio estatutario que adquirió un carácter cuasi-constitucional que forma parte del debido proceso de ley. *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022); *Pueblo v. Esquilín Díaz*, 146 DPR 808, 815-816 (1998); *Pueblo v. Prieto Maysonet*, 103 DPR 102, 104 (1974). Este Tribunal de Apelaciones, una vez adquirida la jurisdicción de la controversia, tiene el deber de resolver el recurso de apelación en sus méritos. *Pueblo v. Colón Canales*, 152 DPR 284, 291 (2000). Por ello, los tribunales apelativos poseemos la facultad de examinar cualquier error de derecho cometido por los tribunales de primera instancia, así como cualquier asunto de hecho y derecho. *Pueblo v. Rivera Ortiz, supra*, págs. 421-422; *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). Pues, como cuestión de derecho, la determinación de probar la culpabilidad de una persona más allá de duda razonable es revisable, dado que la apreciación de la prueba es un asunto tanto de hecho como de derecho. *Pueblo v. Irizarry*, supra; *Pueblo v. Torres Medina*, supra; *Pueblo v. Rivero Lugo y Almodóvar*, 121 DPR 454, 473 (1988); *Pueblo v. Pagán Díaz*, 111 DPR 608, 621 (1981).

Es norma hartamente conocida que el juzgador de los hechos está en mejor posición para apreciar y aquilatar la prueba presentada. *Pueblo v. Casillas, Torres,* 190 DPR 398, 416 (2014). A esos efectos, la apreciación de la prueba del juzgador de los hechos merece gran respeto y deferencia por parte de un foro apelativo. *Id.* Así las cosas, los tribunales apelativos solamente intervendremos con la apreciación de la prueba cuando se demuestre existencia de *pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Casillas, Torres,* pág. 417; *Pueblo v. Rivera Ortiz,* supra, pág. 422; *Pueblo v. Irizarry,* supra, págs. 788-789.

Además, intervendremos cuando surjan serias dudas, razonables y fundadas sobre la culpabilidad de la persona acusada. *Pueblo v. Casillas, Torres, supra*; *Pueblo v. Irizarry, supra,* pág. 789. Sin embargo, "si de un análisis ponderado de la prueba desfilada ante el foro primario surge duda razonable y fundada sobre si la culpabilidad del acusado fue establecida más allá de duda razonable, este Tribunal tiene el deber de dejar sin efecto el fallo o veredicto condenatorio". *Pueblo v. Casillas, Torres,* supra.

Cuando un acusado presenta un recurso de apelación en el que plantea como error insuficiencia de la prueba, así como errores de derecho, los foros apelativos realizaremos un escrutinio de dos (2) partes. *Pueblo v. Ortiz Colón,* 207 DPR 100, 125 (2021). En primer lugar, evaluaremos la alegación de insuficiencia de prueba que, de ser meritoria, procede absolver al acusado. *Id.* Ahora bien, si el reclamo de insuficiencia de la prueba resulta inmeritorio, procede atender los errores de derecho. *Id.*

**B. Duda Razonable**

Nuestra Carta Magna, en su Artículo II, Sección 11, establece que los imputados o acusados de delito disfrutan de una presunción de inocencia. Por eso, la Regla 110 de Procedimiento Criminal, 34

LPRA Ap. II, R. 110, dispone que esta presunción deberá ser rebatida, probando lo contrario. El estándar probatorio para que el Estado logre establecer la culpabilidad de un imputado o acusado de delito es la "duda razonable". *Pueblo v. García Colón I*, 182 DPR 129, 174 (2011); *Pueblo v. Ramos Álvarez*, 122 DPR 287, 315-316 (1988). Es decir, se deberá probar su culpabilidad más allá de toda duda razonable. Lo anterior, constituye uno de los imperativos más básicos y esenciales del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786. Cabe recalcar que este es el más riguroso estándar probatorio.

La duda razonable que justifica la absolución del acusado es "el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación." *Pueblo v. Irizarry*, supra, pág. 788. Es decir, la duda razonable no es otra cosa que "la insatisfacción de la conciencia del juzgador con la prueba presentada". *Id.*

Ahora bien, nuestro ordenamiento jurídico establece que un hecho puede establecerse mediante evidencia directa o circunstancial. Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110. La precitada Regla dispone, además, que la prueba directa es aquella "que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente". Por otro lado, la misma Regla establece que la circunstancial "tiende a demostrar el hecho en controversia probando otro distinto, del cual por si o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia".

Con relación a la prueba testifical, tanto la precitada Regla, como nuestra jurisprudencia, ha sido clara en que aquel testimonio al que el juzgador le merezca entero crédito será suficiente para probar un hecho. *Id*; *Pueblo v. Chévere Heredia,* 130 DPR 1, 19-21

(1995). Es por esta deferencia a la credibilidad que otorgue el juzgador de los hechos a un testigo, que aun si se encontrara falsedad en parte sus declaraciones, no será necesario descartar el resto de su testimonio. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 260 (2011); *Pueblo v. Pagán Ortiz*, 130 DPR 470, 483 (1992).

Por otra parte, es norma reiterada que la apreciación que hace un juzgador de los hechos y de la prueba que desfila en el juicio es una cuestión mixta de hecho y de derecho. *Pueblo v. González Román*, 138 DPR 691, 708 (1995); *Pueblo en interés del menor F.S.C.*, 128 DPR 931, 942 (1991). Por esto, la misma es revisable en apelación. Id. Por otro lado, tal apreciación incide sobre la suficiencia de la prueba, capaz de derrotar la presunción de inocencia, lo que puede convertir este asunto en uno de derecho.

Nuestro Tribunal Supremo ha enfatizado, en ocasiones repetidas, que la valoración y el peso que el juzgador de los hechos le imparte a la prueba y a los testimonios presentados ante sí *merecen respeto y confiabilidad* por parte de este Tribunal. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991); *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 551 (1974). Como corolario de lo anterior, *salvo que se demuestre la presencia de error manifiesto, pasión, prejuicio o parcialidad*, el foro apelativo no debe intervenir con la evaluación de la prueba hecha por el juzgador de hechos. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 98-99 (2000); *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991).

No obstante, el foro apelativo podrá intervenir con tal apreciación cuando de una evaluación minuciosa surjan "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Carrasquillo Carrasquillo, supra,* pág. 551. Ante la inconformidad que crea la duda razonable, los tribunales apelativos, aunque no están en la misma posición de apreciar la credibilidad de los testigos, sí tienen, al igual que el Foro Apelado,

"no sólo el derecho [,] sino el deber de tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry*, supra, pág. 790; *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 552.

Por ende, el Foro Primario está en mejor posición para aquilatar la prueba testifical que ante sí se presenta, ya que es quien tiene ante sí a los testigos cuando declaran. *Pueblo v. González Rivera*, 207 DPR 846, 848 (2021); *E.L.A. v. P.M.C.,* 163 DPR 478, 490 (2004); *Argüello v. Argüello,* 155 DPR 62, 79 (2001). El juzgador de los hechos es quien goza del privilegio al poder apreciar el comportamiento del testigo, o el 'demeanor', lo que le permite determinar si le merece credibilidad o no. Este es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones, manerismos, dudas y vacilaciones. *Pueblo v. Cruz Rosario*, 204 DPR 1040, 1057-1058 (2020); *Pueblo v. Toro Martínez*, 200 DPR 834-857-858 (2018); *Pueblo v. García Colón I,* supra, pág. 165; *Pueblo v. Viruet Camacho*, 173 DPR 563, 584-585 (2008). Resulta importante destacar que "el testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio". *Pueblo v. Toro Martínez*, supra, pág. 860.

Por último, luego que recae un veredicto de culpabilidad, permea una presunción de corrección sobre el dictamen.

### C. Derecho a Juicio por Jurado

Debido a que el juicio por un jurado imparcial garantizado por la Sexta Enmienda de la Constitución federal es un derecho fundamental, los Estados deben asegurar dicho derecho por virtud del debido proceso de ley de la Decimocuarta Enmienda. *Duncan v. Louisiana*, 391 US 145 (1968). Por ello, el derecho a juicio por jurado aplica en toda su extensión en Puerto Rico. *Pueblo v. Torres Rivera*

*II*, supra, pág. 304; *Pueblo v. Santana Vélez*, 177 DPR 61, 65 (2009); *Pueblo v. Laureano*, 111 DPR 447 (1984).

Por muchos años este derecho no fue considerado fundamental, oponible solo frente al Gobierno federal. Sin embargo, desde el caso de *Duncan v. Louisiana*, 391 US 145 (1968) la normativa jurídica en cuanto al tema fue evolucionando. De esta manera, por conducto de la interpretación sobre la Decimocuarta Enmienda de la Constitución federal, este derecho comenzó a oponerse frente a los Estados. Aquí en Puerto Rico, la jurisprudencia y la legislación se alineo al respecto. *Pueblo v. Casellas Toro*, 193 DPR 1003, 1014 (2017); *Pueblo v. Santana Vélez*, supra, pág. 65; Ley Número 8 y 9 de 7 de julio de 1971 (las cuales tipifican y establecen la pena que acarrean los delitos menos graves).

Por otro lado, a través de los años, con repercusiones más recientes en su desarrollo, tanto la máxima corte en la esfera federal, como en la local, han atendido el asunto sobre la unanimidad en los veredictos por jurado. *Apodaca v. Oregon*, 406 US 404 (1972); *Johnson v. Louisiana*, 406 US 356 (1972); *Pueblo v. Casellas Toro*, supra.

En lo que respecta nuestra jurisdicción, el Artículo II, Sección 11 de la Constitución de Puerto Rico establecía, y aun así reza, que "[e]n los procesos por delito grave el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial compuesto por doce vecinos del distrito, quienes podrán rendir veredicto por mayoría de votos en el cual deberán concurrir no menos de nueve". Incluso, la Regla 112 de Procedimiento Criminal, supra, establece lo previo de manera estatutaria.

Sin embargo, cuando se decidió *Ramos v. Louisiana*, supra, la Corte Suprema Federal determinó que la precitada Sexta Enmienda requiere que los imputados de delito *que son juzgados por un jurado*, así lo sean mediante veredicto unánime. Además, dejó claro que esta

nueva norma constitucional aplicaría retroactivamente a casos que no hayan advenido final y firme. Id. pág. 1397. Sin embargo, reconoció que los convictos con la facultad de solicitar un nuevo juicio serían aquellos que, no habiendo advenido finales y firmes sus sentencias, hayan sido convictos por jurados no unánimes. Id. pág. 1406. Muy poco después, nuestro Alto Foro atendió el caso de *Pueblo v. Torres Rivera II*, supra. En el mismo, adoptó la normativa de *Ramos v. Louisiana*, supra. *Id.* pág. 301.

Durante el año siguiente, nuestro Máximo Foro volvió a expresarse en *Pueblo v. Centeno*, 208 DPR 1 (2021). En el mismo estableció que un veredicto de no culpabilidad se tiene que alcanzar por unanimidad para no quebrantar la Sección 11 de la Carta de Derechos de la Constitución de Puerto Rico. Id. pág. 20. Esto, ya que la unanimidad es una cualidad inmanente del derecho a un juicio por jurado. *Pueblo v. Torres Rivera II*, supra. Esta norma es aplicable retroactivamente a los casos cuyas sentencias no hayan advenido final y firme, dado que están pendientes de revisión. Íd., págs. 305-306; *Pueblo v. Rosario Paredes*, 209 DPR 155, 164-165 (2022).

### D. Renuncia a Juicio por Jurado

Ahora bien, el derecho a un juicio por jurado puede ser renunciado por el imputado de delito. *Pueblo en interés del menor R.G.G.,* 123 DPR 443, 465 (1989); *Pueblo v. Camacho Vega,* 111 DPR 497, 498 (1981); *Pagán Hernández v. U.P.R.,* 107 DPR 720, 738 (1978); *Pueblo v. Torres Nieves*, 105 DPR 340, 350 (1976). A esos efectos, la Regla 111 de Procedimiento Criminal, supra, dispone que en los casos de delito grave y en ciertas circunstancias en los delitos menos grave, serán juzgados por un jurado, "a menos que el acusado renunciare expresa, inteligente y personalmente al derecho a juicio por jurado".

La jurisprudencia local y federal no ha producido una fórmula matemática sobre qué elementos – más allá de los delimitados previamente – requieren dialogarse o advertirse para que la renuncia de un imputado de delito, con relación a sus derechos constitucionales, sea inteligente y válida. Sin embargo, un estudio sobre las expresiones de nuestro Alto Foro y otras jurisdicciones a nivel federal (y con quienes hemos sido equiparados en la responsabilidad de interpretar y proteger el derecho a juicio por jurado) dejan en relieve que no es necesario que, al momento de renunciar a un derecho, el imputado de delito debe entender o conocer cada minúsculo detalle o consecuencia de así hacerlo. *Pueblo v. Millán Pacheco*, 182 DPR 595, 611 (2011); *United States v. Frechette*, 456 F.3d 1 (1er Cir. 2006); *Syptma v. Howes*, 313 F.3d 363, 370 (6to. Cir. 2002); *State v. Kenney*, 516 So.2 175 (1987); *Williams v. DRobertis*, 715 F.2d 1174 (7mo. Cir. 1983). Lo que es importante es que el juez del Foro Primario se cerciore que dicha renuncia sea *libre y voluntaria, espontánea e inteligente,* como salvaguarda adicional de ese valioso derecho. *Pueblo v. Candelaria*, 103 DPR 552, 554 (1975); *Pueblo v. Acevedo Colón,* 103 DPR 502, 506 (1975); *Pueblo v. De Jesús Cordero*, 101 DPR 492, 498 (1973).

Persuasivo aún más a la controversia que nos ocupa, la Corte Apelativa del Estado de California expresó en el año 2016 que la renuncia a un juicio por jurado puede ser válida, aun cuando no se le haya informado completamente sobre el requisito de unanimidad en el veredicto. *People v. Doyle*, 19 Cal. App. 5th 946 (2016). En el precitado caso, Doyle arguyó que su renuncia a juicio por jurado fue inadecuada, ya que no sabía que el veredicto debía ser unánime. Sin embargo, el Foro Apelado explicó lo siguiente:

> Aquí, el Tribunal de Primera Instancia fue informado por la abogada de defensa que se discutió con el acusado el asunto de la renuncia a juicio por Jurado, luego de que este fue estabilizado del medicamento administrado, y que estaba preparado para así renunciar a su derecho. El Tribunal de

> Primera Instancia luego le informó al acusado que el estándar probatorio – más allá de duda razonable – sería el mismo si escogía un jurado o el tribunal de derecho.
> [...]
> Es cierto que al acusado nunca se le informó que tenía derecho a un veredicto unánime, por un Jurado de doce (12). Sin embargo, no existe requisito que exija a un Tribunal explicarle a un acusado sobre cada aspecto al que renuncia, al abdicar su derecho a un juicio por jurado. (Citas omitidas).
> *Id.*
> (Traducción nuestra).

Además, lo cierto es que hay otros Estados y Circuitos Apelativos Federales que han resuelto de igual forma, entendiendo que el desconocimiento de elementos como la unanimidad y composición del jurado no invalidan una renuncia inteligente y voluntaria. *State v. Feregrino*, 756 N.W. 2d 700, 706 (Iowa 2008); *State v. Fitzpatrick*, 810 N.E. 2d 927 (2004); *Marone v. United States*, 10 F.3d 65 (2ndo Cir. 1993).

Finalmente, resulta forzoso señalar que, aun cuando un imputado de delito puede retirar su renuncia a un juicio por jurado, si la misma fue hecha conforme a derecho, es la prerrogativa del juzgador permitirlo o no. *Pueblo v. Torres Cruz,* 105 DPR 914 (1977). El precitado caso detalla unos criterios que deben evaluarse, antes de permitir que un acusado retire su renuncia a juicio por jurado. Primeramente, debe hacerse previo a la iniciación del juicio. *Id.* págs. 918-919. Además, debe el juzgador abstenerse de permitir la retirada a la renuncia, si así hacerlo demora injustificadamente los procedimientos, el remedio perjudique al Estado, así hacerlo sea un inconveniente innecesario para los testigos o si se demuestra que el acusado ha actuado de mala fe. *Id.*

### III.

Ortiz Colón acude ante nos para impugnar la *"Sentencia"* recaída en su contra el 22 de noviembre de 2022. En su recurso apelativo, plantea dos (2) errores. En el *primero de estos,* alega que el TPI-Aibonito emitió un fallo de culpabilidad por no haberse

establecido su culpabilidad más allá de duda razonable. *No le asiste razón.*

En su recurso, el apelante plantea que los testimonios de los agentes no lo identificaron, y los testimonios de la madre y de la pareja del occiso, no constituyeron prueba corroborativa. Por otro lado, arguye que la credibilidad del testimonio del hermano de la víctima resulta sospechosa, ya que este lo identifica, pero admite no haber conocido su nombre.

Sin embargo, una sosegada lectura de los testimonios vertidos en el juicio, nos convencen de lo contrario. Lo cierto es que los testimonios ordenados y organizados de los agentes corroboran la obtención de la primera pista a identificar al apelante – su nombre. El agente Díaz Santana testificó que cuando llegó a la escena del crimen, observó y escuchó a una dama gritando que el delito lo había cometido 'Nefti'.[38] Además, se explicó con detalle como esta información, en cadena, llegó a los agentes a cargo de la investigación.

Por otro lado, entendemos que los testimonios de la madre y de la pareja del occiso sí aportaron a la corroboración del apelante como autor del crimen. Colón Berrios, expareja consensual del occiso, testificó haber conocido personalmente al apelante, y sobre las últimas conversaciones que tuvo la víctima por teléfono – las cuales incriminaban al apelante. Por su parte, Negrón Ortiz, madre del occiso, declaró que luego de lo ocurrido, tuvo una corazonada de quién había matado a su hijo. Este evento, en el que ella gritó que había sido 'Nefti', se corroboró con el testimonio del agente Díaz Santana, quien la conocía y la vio hacer esa espontánea expresión. Además, esto ocurrió antes de que llegara Colón Berrios a la escena – quien tenía una sospecha informada de que 'Nefti' había cometido

---

[38] Transcripción de la prueba oral, págs. 612-614.

el crimen – y tuviera la oportunidad de hablar con la madre del occiso.

Con relación al testimonio de Rosado Negrón, hermano del occiso, declaró que obtuvo el nombre de 'Nefti' de Colón Berrios.[39] Luego, explica que hizo una búsqueda en Facebook, para corroborar lo que pudo observar del asesinato. La información obtenida de esta búsqueda – en específico la foto del vehículo con el apelante – fue corroborado por el agente Díaz Santana, quien testificó haber investigado la cuenta de Facebook del apelante, y haber visto las mismas fotos apreciadas por Rosado Negrón.[40]

Lo cierto es que el Foro Apelado, no solo escuchó estos testimonios, sino que pudo aquilatar la credibilidad que le merecía a cada uno. ***Justipreciamos que el TPI-Aibonito no incurrió en perjuicio, error o parcialidad al así hacerlo***, por lo que le otorgamos la debida deferencia a su apreciación de la prueba.

Con relación al *segundo planteamiento de error*, el apelante Ortiz Negrón arguye que el Foro Primario se equivocó al no restituirle su derecho a juicio por jurado, luego de haber renunciado a él. *No le asiste razón.*

Luego de observar los documentos que obran en los autos originales del caso de epígrafe, entendemos, sin contención de ninguna de las partes, que la renuncia hecha en 24 de julio de 2019 fue libre, voluntaria e inteligentemente. Específicamente, del documento titulado *"Derecho al Juico por Jurado"* aparece la firma del aquí apelante, la de su representante legal y del Ministerio Público. Además, la *Minuta* de ese día, *24 de julio de 2019* y transcrita el 2 de agosto de 2019, se destaca que el abogado del apelante *"indicó que su representado iba a renunciar al juicio por jurado, que se había llenado el documento de renuncia a juicio por*

---

[39] Transcripción de la prueba oral, págs. 1769-1772.
[40] *Id*. pág. 626.

*jurado, ya que era el deseo de su representado que el caso se viera por Tribunal de Derecho"*.[41] Y finalmente, *"[e]l Tribunal procedió a examinar al acusado en cuanto a la renuncia al juicio por jurado, la cual aceptó por entender que era una válida y conforme al derecho y decretó que los procedimientos continuaran por Tribunal de Derecho"*.[42]

Ahora bien, argumenta el apelante que, por lo resuelto en el caso de *Ramos v. Louisiana*, supra, no es posible entender la renuncia al juicio por jurado que enfrentó en el año 2021, como una hecha inteligentemente.

Si bien es cierto que el estado de derecho cambió con el precitado caso, el mismo no incide de ninguna manera en la voluntariedad o inteligencia de su renuncia al juicio por jurado. Como vimos previamente, la jurisprudencia local nunca ha evaluado la legalidad de una renuncia a derechos constitucionales de manera absoluta. Es decir, la falta de algunos entendidos en estos ejercicios, no son causa automática para invalidarlos. Si así fuera, los imputados y acusados de delitos podrían ocasionar un desconcierto procesal, renunciado a sus derechos, para luego, arbitrariamente, solicitar su restitución.

Por otro lado, múltiples foros judiciales estatales y federales en los Estados Unidos han sido claros, consistentes y enfáticos: el desconocimiento de los mecanismos relevantes a la unanimidad en los veredictos, no invalida una renuncia conforme a derecho sobre el juicio por jurado. ***Esto último nos persuade en gran manera.***

Finalmente, lo cierto es que la restitución de estas renuncias siempre ha sido materia ***discrecional*** del Tribunal. Además, luego de evaluar la totalidad del expediente que nos ocupa, entendemos que los elementos de *Pueblo v. Torres Cruz*, supra, no se

---

[41] Autos Originales del caso BLA2018G0087-89, Tomo II.
[42] *Id.*

materializan, por lo que resultó correcto en derecho sostener el juicio del apelante por tribunal de derecho.

**IV.**

Por los fundamentos que anteceden, *confirmamos la "Sentencia" apelada.*

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones