Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| **EL PUEBLO DE PUERTO RICO**<br><br>Apelado<br><br><br>v.<br><br><br>**KARINA BORGES DOMENECH**<br><br>Apelante | KLAN202300262 | **APELACIÓN**<br>Procedente del Tribunal de Primera Instancia, Sala Superior de **Caguas**<br><br>Caso Núm.:<br>**E LE2019G0171**<br>**E LE2019G0172**<br>**E LE2019G0173**<br>**E1TR201900369**<br><br>Sobre: **ART. 7.06 LEY 22 (3 CARGOS), ART. 7.02 LEY 22 del 7 de enero de 2000, enmendada** |

Panel integrado por su presidente el Juez Adames Soto, la Juez Martínez Cordero y el Juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 9 de mayo de 2025.

Comparece ante nos, Karina Borges Domenech, en adelante, Borges Domenech o apelante, solicitando que revisemos la *"Sentencia"* del Tribunal de Primera Instancia, Sala Superior de Caguas, en adelante, TPI-Caguas, del 6 de marzo de 2023. En la misma, la apelante fue sentenciada a cumplir quince (15) años de reclusión, y al pago de una multa de $650.00.

Por los fundamentos que expondremos a continuación, *confirmamos* el dictamen apelado.

**I.**

Los hechos de este caso tienen su génesis el *23 de diciembre de 2018,* producto de un accidente automovilístico en la Carretera 788 del Barrio Quemados del Municipio de San Lorenzo, frente a la

---

[1] Véase Orden Administrativa OATA-2023-131 del 14 de julio de 2023, donde se designa al Juez Alberto Luis Pérez Ocasio en sustitución de la Juez Gloria L. Lebrón Nieves.

Lechonera Los Compadres.[2] Mientras conducía *en estado de embriaguez*, Borges Domenech impactó en horas de la noche a los peatones Juan Quiñones Adorno, María Fonseca y Agustín Oquendo frente al mencionado establecimiento de comida. Por este evento, se presentaron sendas denuncias contra la apelante, el *25 de junio de 2019*, ante el TPI-Caguas, por infracciones al Artículo 7.02 (un [1] cargo) y al Artículo 7.06 (tres [3] cargos) de la Ley de Vehículos y Tránsito de Puerto Rico, en adelante, Ley de Tránsito, Ley Núm. 22 de 7 de enero de 2000, 9 LPRA seccs. 5202 y 5206.

La Vista Preliminar fue originalmente señalada para el 2 de julio de 2019, pero fue recalendarizada en varias ocasiones. El 9 de agosto de 2019, durante una de estas vistas, la defensa de Borges Domenech solicitó la desestimación de los cargos en su contra, al amparo de la Regla 64(n) de Procedimiento Criminal, 34 LPRA Ap. II, R. 64. Planteó violación a juicio rápido, ya que Borges Domenech fue arrestada el 23 de diciembre de 2018, por lo que habían pasado los términos dispuestos en la referida Regla. Sin embargo, el Foro Primario declaró *"No Ha Lugar"* la solicitud. Finalmente, el 16 de septiembre de 2019 se celebró la Vista Preliminar, y se determinó Causa Probable para Acusar.

El 18 de septiembre de 2019, el Ministerio Público, en adelante, apelado, radicó las acusaciones contra la apelante, y el 1 de octubre de 2019, se celebró la vista de Lectura de Acusación. No obstante, el 8 de octubre de 2019, Borges Domenech radicó una *"Moción al Amparo de la Regla 64(n) de Procedimiento Criminal"*, alegando nuevamente que se violó su derecho a juicio rápido. Alegó que la Vista Preliminar no había sido celebrada dentro de los sesenta (60) días prescritos. Además, sostuvo que ya habían pasado los

---

[2] Los Autos Originales del caso de epígrafe fueron elevados a este Tribunal el 18 de abril de 2023. Los hechos en adelante reseñados, salvo nota en contrario, provienen de los Tomos I y II de estos.

ciento veinte (120) días para que se celebrara juicio en su fondo. Por ello, solicitó la desestimación de las acusaciones en su contra.

Por su parte, el Ministerio Público se opuso a la solicitud de desestimación de la apelante. En su contestación, la apelada expuso que los sesenta (60) días comienzan a cursar el momento en que el imputado *está sujeto a responder*, que en este caso, es la fecha de la Vista para Determinar Causa Probable para Arresto. Explicó, además, que los ciento veinte (120) días para el juicio no se habían cumplido, ya que los términos quedaron interrumpidos en varias ocasiones por las suspensiones solicitadas por la propia defensa de Borges Domenech.

El 16 de enero de 2020, el Foro Primario celebró una conferencia de estatus, en la que declaró *"No Ha Lugar"* la solicitud aludida. La representación legal de la apelante solicitó que el Tribunal se expresara mediante *"Resolución"* para apelar su decisión. Así las cosas, el 27 de enero de 2020, el TPI-Caguas notificó una *"Resolución"* en la que declaró *"No Ha Lugar"* la solicitud de desestimación de la apelante, al amparo de la Regla 64(n) de Procedimiento Criminal, supra.

Inconforme, el 25 de febrero de 2020, Borges Domenech recurrió ante esta Curia mediante un recurso de *certiorari*.[3] En su petitorio, arguyó que el Foro Primario se equivocó al no celebrar una vista evidenciaria, conforme lo dispuesto por la Regla 64 de Procedimiento Criminal, supra. El 31 de agosto de 2020, un Panel hermano de este Tribunal revocó la *"Resolución"* del 27 de enero de 2020, ordenando así que el TPI-Caguas celebrara una vista evidenciaria antes de determinar si se violó el derecho a juicio rápido de Borges Domenech.

---

[3] KLCE202000194.

En cumplimiento de orden, el 4 de marzo de 2021, el TPI-Caguas celebró la vista evidenciaria para atender la solicitud de desestimación al amparo de la Regla 64(n) de Procedimiento Criminal, *supra*. Así las cosas, el 10 de marzo de 2021, el Foro Apelado emitió una *"Resolución"*, declarando *"No Ha Lugar"* la misma.

Sin embargo, el 5 de abril de 2021, Borges Domenech recurrió nuevamente a este Tribunal para impugnar la precitada determinación del Foro Primario mediante recurso de *certiorari*.[4] El 28 de abril de 2021, un Panel hermano emitió una *"Resolución"* en la que denegó expedir el auto. Inconforme, mediante otro recurso de *certiorari*, la apelante recurrió al Tribunal Supremo solicitando la revisión de la determinación del Foro Primario.[5] Nuestro Alto Foro, mediante *"Resolución"* del 11 de junio de 2021, declaró *"No Ha Lugar"* la misma. Borges Domenech solicito una reconsideración, que fue declarada, de igual forma, *"No Ha Lugar"* el 15 de octubre de 2021.

Luego de varias instancias procesales que no requieren reseña, *el juicio por jurado* contra la apelante se celebró los días 23 y 27 de junio de 2022; 12, 13, 15 y 28 de septiembre de 2022; 13 y 14 de octubre de 2022; y 2 de diciembre de 2022. Durante el juicio, se presentaron los siguientes testigos y sus testimonios:

**Evelyn Medina Conde**[6]

La testigo trabaja para el Negociado de Sistema de Servicios de Emergencia del 911 desde el año 1997.[7] Actualmente, es la Administradora de Documentos de la agencia. Testificó que el 27 de diciembre de 2018 le llegó una orden judicial, solicitando la

---

[4] KLCE202100403.
[5] CC-2021-0331.
[6] Transcripción *física* de la prueba oral, pág. 2.
[7] *Id.*, pág. 2.

grabación y escrito de un accidente ocurrido el 23 de diciembre de 2018, en el Municipio de San Lorenzo en horas de la noche.[8]

Para esto, Medina Conde confirmó que la transcripción del audio corresponde a lo ocurrido en la llamada al sistema de emergencias 911 del día de los hechos.[9]

### Agente José Flores Orellana[10]

El testigo es agente estatal de la Policía de Puerto Rico hace doce (12) años.[11] Actualmente, labora en prevención, tomando querellas en los distritos a los que es asignado.[12] Testificó que el 23 de diciembre de 2018 se encontraba de retén en el Cuartel de Distrito de San Lorenzo, cuando recibió una llamada sobre un incidente ocurrido en el Barrio Quemados de dicho municipio.[13] Explicó que no tenía relevo en su puesto, por lo que se comunicó con el Sargento William de Jesús para coordinar acudir al lugar de los hechos.[14]

Luego de unos arreglos, el testigo y el Sargento se dirigieron a la escena, y llegaron allí aproximadamente a las 9:30 pm.[15] Allí pudo ver que había un varón en el suelo, y otra persona que fue llevada de la escena en ambulancia.[16] Explicó que en el lugar la iluminación provenía del negocio la Lechonera los Compadres. Indicó que, en el lugar, su trabajo consistió en preservar la escena, de manera que nadie interfiriera con ella.[17]

Por otro lado, testificó que el Agente Suárez tomó cargo de la investigación.[18] Como parte de su trabajo en este caso, transportó a Borges Domenech, a quien identificó en sala, junto al Sargento de

---

[8] Transcripción *física* de la prueba oral, pág. 3.
[9] *Id.*, págs. 4-9.
[10] *Id.*, pág. 15.
[11] *Id.*
[12] *Id.*, pág. 16.
[13] *Id.*
[14] *Id.*
[15] *Id.*, pág. 17.
[16] *Id.*
[17] *Id.*, pág. 18.
[18] *Id.*

Jesús, al Cuartel de la Policía en el Municipio de Caguas para realizarle la prueba de alcohol.[19] Expuso, además, que Borges Domenech lucía llorosa y preocupada por lo ocurrido. Según su testimonio, en el Cuartel, el Agente Muñiz Maestre le realizó la prueba de alcohol.[20]

### Teniente Segundo William de Jesús[21]

El testigo es el Director de la División de Propiedad del Cuerpo de Investigación Criminal.[22] El 23 de diciembre de 2018 el testigo fungía como Sargento adscrito al Cuartel de Distrito del Municipio de San Lorenzo en el turno de la noche.[23] Testificó que llegó a la escena de los hechos en cuestión, frente a la Lechonera los Compadres, con el Agente Flores Orellana.[24] Añadió que la iluminación del lugar surgía de las luces del negocio.[25] Indicó que cuando llegaron, el Teniente Vargas, de la Policía Municipal de San Lorenzo tenía bajo su control la escena.[26] Expresó que había un cuerpo en el piso, cubierto con una sábana blanca.

Luego de identificar a Borges Domenech en sala, testificó que los agentes municipales la custodiaban.[27] De allí, transportó junto a Flores Orellana a la apelante, la cual describió como llorosa y desorientada, al Cuartel de la Policía del Municipio de Caguas para que se le hiciera la prueba de alcohol.[28] El testigo se quedó en el vehículo oficial, mientras Flores Orellana custodiaba a Borges Domenech hacia el Cuartel.

---

[19] Transcripción *física* de la prueba oral, págs. 19-20.
[20] *Id.*, pág. 20.
[21] *Id.*, pág. 22.
[22] *Id.*
[23] *Id.*
[24] *Id.*, pág. 23.
[25] *Id.*, pág. 27.
[26] *Id.*, pág. 24.
[27] *Id.*, pág. 25.
[28] *Id.*, pág. 26.

**Agente Marcos Córdova Vázquez**[29]

El testigo trabaja para la Policía de Puerto Rico hace treinta y cinco (35) años.[30] Este se desempeña como técnico del Cuerpo de Investigaciones Criminales de Caguas.[31] Como parte de sus funciones, el testigo recopila información, fotos, huellas, videos, entre otros, en las escenas de crimen.[32]

Testificó que el 23 de diciembre de 2018 recibió una llamada del Centro de Mando para que se personara a la Lechonera los Compadres, en donde había ocurrido un accidente. Indicó que llegó al lugar aproximadamente a las 11:00 p.m.[33] Explicó que, una vez allí, se entrevistó con el agente investigador del caso, tomó las notas de rigor y tomó fotos del lugar, el auto, el cuerpo, etc.[34] Testificó que el cuerpo se encontraba sobre la grama del lugar de los hechos.[35]

Por otro lado, declaró que la iluminación del lugar provenía de la Lechonera los Compadres.[36] Testificó, además, que se utilizaron focos portátiles para iluminar, pero no se tomaron fotos del área con los focos apagados.[37] No obstante, sostuvo que la iluminación del lugar era suficiente.[38] El Agente explicó que solo tomo fotos, y que no levantó prueba de sangre. Durante su testimonio, las partes presentaron en sala, por medio del testigo en cuestión, fotos del área, su iluminación, del vehículo accidentado y del local.[39]

**Agente Zuleyka Santiago Baden**[40]

La testigo trabaja para la Policía de Puerto Rico hace once (11) años.[41] Al momento de los hechos del caso de marras, la Agente

---

[29] Transcripción *física* de la prueba oral, pág. 34.
[30] *Id.*, pág. 35.
[31] *Id.*
[32] *Id.*
[33] *Id.*, pág. 36.
[34] *Id.*, págs. 37-38.
[35] *Id.*, pág. 38.
[36] *Id.*, pág. 39.
[37] *Id.*, págs. 43-45.
[38] *Id.*, págs. 46-47.
[39] *Id.*, págs. 47-57.
[40] *Id.*, pág. 60.
[41] *Id.*

pertenecía a la Unidad de Alcohol, Radar y Fotómetro ubicada en el Municipio de Bayamón.[42] Además, explicó que es técnica e instructora del instrumento *Intoxilyzer* 9,000.[43] Con este aparato, explicó que los técnicos pueden hacer pruebas de aliento, de manera que se pueda identificar la cantidad de alcohol en el organismo del sujeto a prueba.[44]

La Agente testificó sobre los procesos de realizar la prueba de campo y recopilar la información. Además, explicó los pormenores del cuidado, calibración y mantenimiento del equipo.[45]

### Salvador Fabre[46]

El testigo es Químico del Departamento de Salud desde el año 1999.[47] Como parte de sus funciones, Fabre verifica las calibraciones del equipo *Intoxilyzer* 9,000 de la Policía de Puerto Rico y analiza las muestras de sangre realizadas a conductores en estado de embriaguez.[48] Explicó, además, que este instrumento se verifica al menos una vez al mes.[49]

A través de su testimonio, se presentó la copia fiel y exacta del documento que preparó con la información del *Intoxilyzer* 9,000 para los meses noviembre y diciembre del año 2018, y para el mes de enero del año 2019.[50] Surge, de ellos, que la máquina cumplía con los requisitos reglamentarios del Departamento de Salud.

### Agente Carlos Muñoz Maestre[51]

El testigo trabaja para la Policía de Puerto Rico hace dieciocho (18) años.[52] Para el 23 de diciembre de 2018, laboraba en la División de Patrullas y Carreteras ubicada en el Municipio de Caguas.[53]

---

[42] Transcripción *física* de la prueba oral, pág. 60.
[43] *Id.*, pág. 61.
[44] *Id.*
[45] *Id.*, págs. 62-69.
[46] Transcripción *digital* de la prueba oral, pág. 4.
[47] Id., pág. 5.
[48] *Id.*
[49] *Id.*, pág. 6.
[50] *Id.*, págs. 7-10.
[51] *Id.*, pág. 15.
[52] *Id.*
[53] *Id.*

Como parte de sus funciones, el Agente trabaja en la investigación y prevención de accidentes de tránsito,[54] además de intervenir por violaciones a la Ley de Tránsito.[55]

El testigo explicó que el 23 de diciembre de 2018 se encontraba en el turno de 8:00 p.m. – 4:00 a.m. como retén en el Cuartel de Patrullas y Carreteras en el Municipio de Caguas.[56] Testificó que a las 10:10 p.m. de esa noche recibió a Borges Domenech, que identificó en sala, y quien había estado involucrada en un accidente de tránsito.[57] Esto, con el propósito de realizarle una prueba de alcohol.

Según le narró al TPI-Caguas, el Agente le explicó a Borges Domenech que debía permanecer por espacio de veinte (20) minutos donde la pudiera observar, sin ingerir, fumar o vomitar, antes de realizarle la prueba.[58] Indicó que esta llegó caminando, consciente y receptiva, pero con los ojos rojizos y llorando.[59] Además, le leyó las advertencias pertinentes en Ley – tanto las de embriaguez como las de sus derechos constitucionales.[60] Además, firmó de manera coherente y cooperadora los documentos de rigor. Finalmente, indicó que esta sopló sin contratiempos, **arrojando un .11% de alcohol en su sistema**.[61] Luego, Borges Domenech pasó al área de espera, en donde se encontraban sus familiares, hasta tanto el Agente investigador llegara para entrevistarla.[62]

**Agente Omar Suárez Borrero**[63]

El testigo trabaja para la Policía de Puerto Rico hace once (11) años.[64] Para la fecha del 23 de diciembre de 2018, el Agente se

---

[54] Transcripción *digital* de la prueba oral, pág. 16.
[55] Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 22-2000, 9 LPRA 5001 *et seq.*
[56] Transcripción *digital* de la prueba oral, pág. 17.
[57] *Id.*, págs. 17-18.
[58] *Id.*, pág. 18.
[59] *Id.*
[60] *Id.*, pág. 19.
[61] *Id.*
[62] *Id.*, pág. 23.
[63] *Id.*, pág. 28.
[64] *Id.*, pág. 29.

desempeñaba en la División de Tránsito y Autopista ubicada en el Municipio de Caguas.[65] Sus funciones consistían en investigar accidentes leves y graves, y aplicar la Ley de Tránsito.[66]

Testificó que el día de los hechos recibió una llamada a las 8:50 p.m. alertando de un accidente que involucró peatones, en el Barrio Quemados del Municipio de San Lorenzo.[67] Indicó que, como se encontraba investigando otro accidente, no es hasta las 9:40 p.m. que se dirigió a la escena junto al Sargento Arístides Vázquez.[68] Explicó que al llegar allí, se encontró con una escena encintada.[69] Relató que observó, entre el pavimento y un área verde, un cuerpo en el suelo, quien resultó ser el finado Agustín Oquendo Serrano.[70] Describió, además, que en el lugar observó un auto marca Acura LX color verde, con número de tablilla GFM-267.[71] Añadió que el referido vehículo, se encontraba chocado en el cristal de al frente, y en ambos lados; en la parte posterior dijo que habían unos patrones de sangre.[72] Luego de hablar con el Agente Flores y el Sargento de Jesús, supo que Borges Domenech era la que conducía el auto Acura LX.[73]

Suárez testificó que procedió a entrevistar a la apelante.[74] En el proceso de realizar esta gestión, el Agente indica que percibió en Borges Domenech olor a alcohol, ojos rojizos, lengua pesada, entre otros, por lo que *le indicó que tenía motivos fundados para creer que se encontraba en estado de embriaguez.*[75]

En consecución, le dijo que, como medida protocolar, debía realizarle una prueba de embriaguez, *por lo que le leyó las*

---

[65] Transcripción *digital* de la prueba oral, pág. 29.
[66] *Id.*
[67] *Id.*, pág. 30.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*, pág. 31.
[72] *Id.*
[73] *Id.*, pág. 32.
[74] *Id.*
[75] *Id.*, pág. 33.

*advertencias de ley.*[76] Indagó con Borges Domenech *si esta había entendido las advertencias, a lo que respondió que sí, y si tenía alguna duda, a lo que respondió que no.*[77]

Luego de cumplir con los procesos iniciales de rigor, el Agente le preguntó a Borges Domenech qué había pasado.[78] Según el testimonio del Agente, Borges Domenech le indicó que se encontraba en Cerro Gordo con su pareja, que bebió cuatro cervezas de botella, y que luego de una discusión con su pareja, lo dejó en su casa, y que estando de camino a la suya, ocurrió el accidente.[79]

Luego de esto, el Agente indicó que le puso las esposas y el Agente Flores y el Sargento de Jesús la llevaron al Cuartel de la Policía en el Municipio de Caguas.[80] Indicó que se comunicó con el Agente Muñoz Maestre, para que le realizara la prueba de aliento a la apelante, quien se encontraba de camino allá.[81] El Agente dice que se quedó en la escena, tomando notas, y testificó cómo lucía el área del accidente.[82] Esto lo hizo a través de las fotografías del cuerpo con sangre, el vehículo impactado, el poste, la carretera, el alumbrado, etc.[83] Indicó, además, que el vehículo de Borges Domenech fue ocupado para la investigación del accidente.[84]

Más tarde se encontró nuevamente con Borges Domenech en el Cuartel de la Policía, en donde llena la documentación pertinente a las advertencias, y ella las firma.[85] El testigo procede a entrevistarla nuevamente, y Borges Domenech le narró los mismos hechos que le confesó en la escena.[86] Finalmente, le indicó que la citaría posteriormente, y esta se fue con un familiar.[87]

---

[76] Transcripción *digital* de la prueba oral, pág. 33.
[77] *Id.*
[78] *Id.*
[79] *Id.*, págs. 33-34.
[80] *Id.*, pág. 44.
[81] *Id.*
[82] *Id.*, pág. 45.
[83] *Id.*, págs. 46-47.
[84] *Id.*, pág. 49.
[85] *Id.*, pág. 50.
[86] *Id.*, págs. 50-51.
[87] *Id.*, pág. 51.

Por otro lado, el Agente explicó que habían dos (2) personas que habían sido arrolladas también en este evento, por lo que se dirigió junto al Sargento Arístides Vázquez al Hospital HIMA San Pablo de Caguas, en donde se encontraba Juan Quiñones.[88] El Agente describió que vio al afectado con el hueso de un brazo expuesto y con rayaduras en el cuerpo.[89] Luego, se dirigió al Centro Médico de Río Piedras, para ver a María Fonseca, y allí le indican que esta había fallecido de camino al hospital.[90]

### Hector Claudio Claudio[91]

El testigo es obrero de construcción desde que tenía trece (13) años, y vive en el Municipio de San Lorenzo.[92] Testificó que el 23 de diciembre de 2018, se encontraba en una cabalgata, con la cual visitó varios negocios.[93] Entre estos, visitaron la Lechonera los Compadres, e indicó que no bebió alcohol, ya que lo iban a operar en el mes de enero del año 2019.[94]

Narró que estando allí, se encontró con Juan Quiñones, a quien conocía bien.[95] Luego de una breve interacción con él, explicó *que vio un vehículo en movimiento a alta velocidad, guiando erráticamente (haciendo 'zig zags') y aventado el lado derecho del mismo sobre una valla.*[96] Claudio Claudio añadió que tuvo que treparse en una verja, para que el auto no lo impactara.[97] Sin embargo, según su testimonio, Juan Quiñones, quien estaba detrás de él, fue impactado por el vehículo.[98]

Por otro lado, explicó que luego de que el vehículo le diera a su amigo por el lado derecho, chocó con un poste e impactó a dos

---

[88] Transcripción *digital* de la prueba oral, pág. 51.
[89] *Id.*, pág. 53.
[90] *Id.*
[91] Transcripción *física* de la prueba oral, pág. 109.
[92] *Id.*
[93] *Id.*, pág. 110.
[94] *Id.*, pág. 111.
[95] *Id.*, pág. 112.
[96] *Id.*, pág. 113.
[97] *Id.*
[98] *Id.*, pág. 114.

(2) personas más.[99] El testigo narra que regresó al negocio para pedir ayuda, en donde llaman a una ambulancia. Sin embargo, explicó que la novia de Juan Quiñones no quiso esperar y lo llevó al hospital en su auto.[100] Luego que Juan Quiñones es removido del área, el testigo narra que se dirigió a donde estaban las otras dos (2) personas, y reconoce a María Fonseca.[101] Añadió que vio al otro cuerpo muerto.[102]

Claudio Claudio testificó que tuvo una breve interacción con Borges Domenech, y que su impresión era que estaba ebria.[103]

### Juan Quiñones[104]

El testigo es un hombre de cincuenta y ocho (58) años que reside en el Barrio Quemados del Municipio de San Lorenzo.[105] Indicó que trabajaba en el almacén de la Droguería Betances.[106] Explicó que el 23 de diciembre de 2018, se dirigió a pie a la Lechonera los Compadres, en donde compartió con unos amigos y bebió unas cervezas.

Según su testimonio, estando en un área verde frente al restaurante, hablando con un amigo, *se percata que viene un auto verde a alta velocidad en dirección hacia él, se aguanta de una verja y es impactado.*[107] Explicó que el vehículo rozó su lado derecho, el brazo y la cadera, y que el impacto lo lanzó al aire, quedando posteriormente inconsciente.[108] Cuando se levanta, caminó con dificultad, con un hueso expuesto en su brazo derecho. Explicó que fue llevado al Hospital HIMA en un vehículo.[109]

---

[99] Transcripción *física* de la prueba oral, pág. 114.
[100] *Id.*, pág. 115.
[101] *Id.*
[102] *Id.*
[103] *Id.*, pág. 117.
[104] *Id.*, pág. 137.
[105] *Id.*
[106] *Id.*, pág. 138.
[107] *Id.*, pág. 141.
[108] *Id.*, págs. 141-142.
[109] *Id.*, pág. 143.

Explicó Juan Quiñones que por la gravedad de sus heridas, fue transportado al Centro Médico de Río Piedras en una ambulancia.[110] El testigo explicó los procesos médicos que enfrentó, y que perdió el trabajo a consecuencia de como el accidente lo incapacitó.[111] Además, se le presentaron fotos al Jurado de las heridas del testigo, y presencialmente, como estaban esas heridas ahora.[112]

### Dra. Rosa Rodríguez Castillo[113]

La testigo es Patóloga Forense del Instituto de Ciencias Forenses, hace veintiocho (28) años.[114] Explicó que realizar una autopsia, comprende evaluar un cuerpo, su superficie corporal externa e interna, para obtener información de la causa y manera de muerte.[115] Durante su testimonio, se le presentaron fotos que se le tomaron a los cuerpos de los occisos.[116] La doctora testificó de las fracturas, contusiones, abrasiones y lesiones traumáticas sufridas por estos en distintas partes de sus cuerpos.[117]

De sus hallazgos surge que las heridas recibidas por Agustín Oquendo *se deben a un vehículo en movimiento a alta velocidad.*[118] Explicó que, en el contexto forense, de acuerdo con los traumas del fallecido, la velocidad en la que fue impactado fluctúa entre 40 a 55 millas por horas.[119] Concluyó, pues, que la muerte de este se debió a un severo trauma corporal.[120]

Con relación a la víctima María Fonseca, la doctora testificó que las fracturas de esta *eran compatibles con un vehículo en movimiento a alta velocidad.*[121] Además, esta sufrió laceraciones y

---

[110] Transcripción *física* de la prueba oral, pág. 144.
[111] *Id.*
[112] *Id.*, pág. 145.
[113] *Id.*, pág. 157.
[114] *Id.*
[115] *Id.*, pág. 159.
[116] *Id.*, pág. 163.
[117] *Id.*, *págs. 164-165.*
[118] *Id.*, págs. 170-171.
[119] *Id.*, pág. 171.
[120] *Id.*, pág. 173.
[121] *Id.*, pág. 175.

abrasiones. Concluyó que la muerte de la víctima se debió, de igual forma, a un severo trauma corporal.[122]

Luego del desfile de estos testigos, de la prueba presentada y dado por sometido el caso, el jurado rindió un veredicto unánime de culpabilidad en todos los cargos. Finalmente, el 6 de marzo de 2023, el TPI-Caguas dictó *"Sentencia"* e impuso las siguientes penas: quince (15) años de cárcel de forma concurrente por tres (3) cargos del Artículo 7.06 de la Ley de Tránsito, supra y una multa de $650.00.

Inconforme, el *30 de marzo de 2023,* Borges Domenech radicó ante esta Curia una *"Apelación Criminal".* En su petitorio, la apelante hace los siguientes señalamientos de error:

> PRIMER ERROR: **Erró el Honorable Tribunal de Primera Instancia al admitir la prueba de alcohol efectuada a la misma en crasa violación a las reglas de evidencia y los derechos constitucionales de la aquí acusada-apelante.**
>
> SEGUNDO ERROR**: Erró el Honorable Tribunal de Primera Instancia al admitir en crasa violación a las Reglas de Evidencia y los derechos constitucionales de la aquí acusada-apelante fotografías del supuesto lugar de los hechos y otras fotografías.**
>
> TERCER ERROR: **Erró el Honorable Tribunal de Primera Instancia al admitir en crasa violación a las Reglas de Evidencia y los derechos constitucionales de la aquí acusada-apelante fotografías de la autopsia efectuada a los occisos del presente caso y otras fotografías.**
>
> CUARTO ERROR**: Erró el Honorable Tribunal de Primera Instancia al declarar no ha lugar la desestimación de los cargos contra la aquí acusada-apelante, por violación a su derecho a juicio rápido.**
>
> QUINTO ERROR: **Erró el Honorable Tribunal de Primera Instancia al encontrar culpable a la acusada-apelante en virtud de que la prueba presentada por el Ministerio Público no estableció su culpabilidad más allá de duda razonable, en ninguno de los delitos y/o sentencias antes indicadas.**

---

[122] Transcripción *física* de la prueba oral, pág. 176.

Así las cosas, durante los siguientes dos (2) años, el caso fue sometido al proceso de rigor para su perfeccionamiento. Ordenamos al TPI-Caguas que elevara los autos originales del caso, los cuales recibimos el 28 de abril de 2023. La transcripción de la prueba oral fue tramitada y recibida en parte digital y en parte física. Posteriormente, el 17 de marzo de 2025, recibimos el *"Alegato"* de la parte apelante. Finalmente, el 21 de abril de 2025, se perfeccionó el recurso apelativo con el recibo del *"Alegato de[l] Pueblo"*. Evaluados los escritos de ambas partes, el expediente del Foro Apelado, así como la transcripción presentada, procedemos a resolver.

**II.**

### A. Apelación Criminal

En nuestro ordenamiento jurídico, toda persona acusada tiene *derecho a apelar* cualquier sentencia penal que recaiga en su contra. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023). Como es sabido, las Reglas 193 y 194 de Procedimiento Criminal, 34 LPRA Ap. II, R. 193 y 194, disponen que una *apelación criminal* se formalizará con la presentación de un escrito ante un foro de mayor jerarquía. *Pueblo v. Arlequín Vélez*, 194 DPR 871, 876 (2016); *Pueblo v. Rodríguez Meléndez*, 150 DPR 519, 522 (2000). Es importante señalar que *la apelación* es un privilegio estatutario que adquirió un carácter cuasi-constitucional que forma parte del debido proceso de ley. *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022); *Pueblo v. Valentín Rivera*, 197 DPR 636, 638 (2017); *Pueblo v. Esquilín Díaz*, 146 DPR 808, 815-816 (1998); *Pueblo v. Prieto Maysonet*, 103 DPR 102, 104 (1974).

Este Tribunal de Apelaciones, una vez adquirida la jurisdicción de la controversia, tiene el deber de resolver el recurso de apelación en sus méritos. *Pueblo v. Colón Canales*, 152 DPR 284, 291 (2000); Artículo 4.006(a) de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, Ley 201-2003, 4 LPRA sec. 24(y). Por

ello, los tribunales apelativos poseemos la facultad de examinar cualquier error de derecho cometido por los tribunales de primera instancia, así como cualquier asunto de hecho y derecho. *Pueblo v. Rivera Ortiz, supra,* págs. 421-422; *Pueblo v. Irizarry,* 156 DPR 780, 788 (2002). Pues, como cuestión de derecho, la determinación de probar la culpabilidad de una persona más allá de duda razonable es revisable, dado que la apreciación de la prueba es un asunto tanto de hecho como de derecho. *Pueblo v. Irizarry,* supra; *Pueblo v. Torres Medina,* supra; *Pueblo v. Rivero Lugo y Almodóvar,* 121 DPR 454, 473 (1988); *Pueblo v. Pagán Díaz,* 111 DPR 608, 621 (1981).

Es norma hartamente conocida que el juzgador de los hechos está en mejor posición para apreciar y aquilatar la prueba presentada. *Pueblo v. Casillas, Torres,* 190 DPR 398, 416 (2014). A esos efectos, la apreciación de la prueba del juzgador de los hechos merece gran respeto y deferencia por parte de un foro apelativo. *Id.* Así las cosas, los tribunales apelativos solamente intervendremos con la apreciación de la prueba cuando se demuestre existencia de *pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Casillas, Torres,* supra, pág. 417; *Pueblo v. Rivera Ortiz,* supra, pág. 422; *Pueblo v. Irizarry,* supra, págs. 788-789.

Cuando un acusado presenta un recurso de apelación en el que plantea como error insuficiencia de la prueba, así como errores de derecho, los foros apelativos realizaremos un escrutinio de dos (2) partes. *Pueblo v. Ortiz Colón,* 207 DPR 100, 125 (2021). En primer lugar, evaluaremos la alegación de insuficiencia de prueba que, de ser meritoria, procede absolver al acusado. *Id.* Ahora bien, si el reclamo de insuficiencia de la prueba resulta inmeritorio, procede atender los errores de derecho. *Id.*

### B. Juicio Rápido

El derecho fundamental, reconocido a los imputados de delito, a un juicio rápido se encuentra consagrado en el Artículo II, Sec. 11, de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1. *Pueblo v. Torres Rivera II*, 204 DPR 288, 296-297 (2020); *Pueblo v. Custodio Colón*, 192 DPR 567 580 (2015); *Pueblo v. Rivera Santiago*, 176 DPR 559, 569 (2009). La protección constitucional se activa cuando se pone en movimiento el mecanismo procesal criminal que atribuye la comisión de un delito a un imputado. *Pueblo v. Custodio Colón,* supra, págs. 580-581.

La Regla 64(n) de Procedimiento Criminal, supra, establece los términos de juicio rápido que rigen cada etapa del proceso penal. Generalmente, el incumplimiento con los términos allí establecidos conlleva que el acusado pueda solicitar la desestimación de la denuncia o acusación. *Pueblo v. García Colón I*, 182 DPR 129, 141 (2011).

Ahora bien, el derecho a juicio rápido no es absoluto ni opera en el vacío. *Pueblo v. García Vega,* 186 DPR 592, 610 (2012).

La evaluación de los tribunales sobre las presuntas violaciones a estos términos, en el ejercicio de su discreción, fue circunscrita y delimitada por nuestro Tribunal Supremo en *Pueblo v. Rivera Tirado*, 117 DPR 419, 432 (1986). En este caso, nuestro Alto Foro adoptó cuatro (4) criterios ideados por el Tribunal Supremo de Estados Unidos, en el caso de *Barker v. Wingo,* 407 US 514, 519-520 (1972). Estos cuatro términos acogidos por nuestra jurisprudencia en el año 1986 contemplan: (1) la duración de la dilación, (2) la razón de esta, (3) el perjuicio que haya provocado la tardanza y (4) la diligencia del que alegue estar afectado por la misma, al reclamar incumplimiento con los términos. *Pueblo v. Custodio Colón,* supra, pág. 582-583; *Pueblo v. García Vega,* supra, pág. 610; *Pueblo v. García Colón I,* supra, pág. 143.

De igual forma, la determinación respecto a la existencia de justa causa para la extensión de los términos de juicio rápido debe realizarse *caso a caso* y dentro de los parámetros de razonabilidad. *Pueblo v. Custodio Colón,* supra, pág. 582.

Por esa razón, ante un planteamiento de violación a los términos de juicio rápido es importante "tomar en cuenta las circunstancias que rodean su reclamo... Es decir, se trata de un derecho que puede ser compartible con cierta tardanza o demora", máxime cuando es atribuible al imputado. *Pueblo v. Rivera Santiago,* supra, págs. 570-571. Véase, además, *Pueblo v. García Vega,* supra, pág. 610. "En fin, este derecho no está limitado por la tiesa aritmética de la regla que lo concibe". *Pueblo v. García Vega,* supra, pág. 610, citando *Pueblo v. Valdés et al.,* 155 DPR 781, 790 (2001).

Ahora bien, con relación a los términos delimitados en la Regla en cuestión, nuestro Alto Foro ha resuelto y reiterado en múltiples ocasiones que los mismos comienzan a decursar "una vez el ciudadano *está sujeto a responder*, esto es, desde que el juez determina causa probable para arrestar, citar o detener a una persona por haber sido acusado de cometer un delito". *Pueblo v. Custodio Colón,* supra, pág. 580. Véase, además, *Pueblo v. García Vega,* supra, pág. 607; *Pueblo v. García Colón I,* supra, pág. 141; *Pueblo v. Thompson Faberllé,* 180 DPR 497, 503-504 (2010); *Pueblo v. Rivera Santiago,* supra, pág. 569; *Pueblo v. Miró González,* 133 DPR 813, 821 (1993). Es decir, el inicio de los términos de juicio rápido se computa *desde que la maquinaria de justicia criminal se activa contra una persona,* de manera "que puede culminar en una convicción". *Pueblo v. Valdés et al.,* supra, pág. 788.

La jurisprudencia ha reconocido este punto de partida como el momento en el que un individuo está "sujeto a responder". *Pueblo v. Morales Roldán,* 213 DPR 1112, 1138-1139 (2024); *Pueblo v. Custodio Colón,* supra, pág. 580; *Pueblo v. García Vega,* supra, pág.

601; *Pueblo v. Rivera Santiago,* 176 DPR 559, 569 (2009); *Pueblo v. Guzmán,* 161 DPR 137, 152 (2004); *Pueblo v. Carrión,* 159 DPR 633, 642 (2003). *Pueblo v. Cartagena Fuentes,* 152 DPR 243, 248 (2000); *Pueblo v. Candelaria Vargas,* 148 DPR 591, 597 (1999); *Pueblo v. Miró González,* supra, pág. 821. En *Pueblo v. Carrión,* supra, pág. 642, nuestro Tribunal Supremo explicó "que estar *'sujeto a responder' supone la presentación de cargos por parte del Ministerio Público*; en otras palabras, que ya pueda hablarse de un proceso judicial que requiera la comparecencia del imputado".

También, es importante aclarar que el arresto de una persona, en sí, no inicia el proceso criminal contra una persona. De hecho, nuestro Tribunal Supremo ha explicado que elementos subjetivos, como la intención de que una intervención tenga el propósito de arrestar o que el intervenido así lo entienda, "no configuran por sí solos un arresto". *Pueblo v. Pacheco Báez,* 130 DPR 664, 669 (1992).

En lo pertinente a la controversia ante nuestra consideración, la Regla 64(n)(2) y (4) de Procedimiento Criminal, supra, dispone lo siguiente:

> La moción para desestimar la acusación o denuncia, o cualquier cargo de estas solo podrá basarse en uno o más de los siguientes fundamentos:
>
> (n) Que existen una o varias de las siguientes circunstancias, a no ser que se demuestre justa causa para la demora o a menos que la demora para someter el caso a juicio se deba a la solicitud del acusado o a su consentimiento:
>
> (1) …
>
> **(2) Que no se presentó acusación o denuncia contra el acusado dentro de los sesenta (60) días de su arresto o citación si se encontraba bajo fianza o dentro de los treinta (30) días si se encontraba sumariado o si se tratare de un caso en que un magistrado autorizó la radicación de las mismas de conformidad con lo dispuesto en la Regla 6(a)**
>
> (3) …

**(4) Que el acusado no fue sometido a juicio dentro de los ciento veinte (120) días siguientes a la presentación de la acusación o denuncia.**

[...]

Se dispone que el tribunal no podrá desestimar una acusación o denuncia, bajo este inciso, sin antes celebrar una vista evidenciaria. En la vista, las partes podrán presentar prueba y el tribunal considerará los siguientes aspectos:

(1) Duración de la demora;

(2) razones para la demora;

**(3) si la demora fue provocada por el acusado o expresamente consentida por éste;**

(4) si el Ministerio Público demostró la existencia de justa causa para la demora, y

(5) Los perjuicios que la demora haya podido causar

(Énfasis suplido).

A la luz de lo anteriormente esbozado, nuestra más Alta Curia resolvió que el término de sesenta (60) días del inciso dos (2) de la Regla 64(n) de Procedimiento Criminal, supra, para acusar o denunciar comienza a transcurrir cuando, entre otras instancias, *se cita a un individuo* a comparecer a la Vista para Determinar Causa Probable para Arrestar. *Pueblo v. García Vega,* supra, pág. 609; *Pueblo v. García Colón,* supra, pág. 142.

Por otro lado, es harto conocido que los ciento veinte (120) días para la celebración de un juicio quedan interrumpidos cuando el mismo es atrasado con cargo a la defensa del acusado. Es decir, un persona puede renunciar, expresa y tácitamente a los términos estatutarios de juicio por jurado. *Pueblo v. Santi Ortiz,* 106 DPR 67, 69-70 (1977); *Pueblo v. Arcelay Galán,* 102 DPR 409, 415 (1974). A estos efectos, nuestro Tribunal Supremo ha expresado que las suspensiones "por justa causa o por causa atribuible al imputado, los términos de juicio rápido comienzan, nuevamente, a discurrir desde la fecha en que estuvieran señaladas las vistas". *Pueblo v. Valdés, supra,* págs. 791-792.

### C. Duda Razonable

Nuestra Carta Magna, en su Artículo II, Sección 11, establece que los imputados o acusados de delito disfrutan de una presunción de inocencia. Por eso, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, dispone que esta presunción deberá ser rebatida, probando lo contrario. El estándar probatorio para que el Estado logre establecer la culpabilidad de un imputado o acusado de delito es la "duda razonable". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146 (2020); *Pueblo v. García Colón I*, 182 DPR 129, 174 (2011); *Pueblo v. Irizarry,* supra, pág. 786-787; *Pueblo v. González Román,* 138 DPR 691, 707 (1995); *Pueblo v. Rosaly Soto,* 128 DPR 729, 739 (1991); *Pueblo v. Ramos y Álvarez*, 122 DPR 287, 315 (1988). Lo anterior, constituye uno de los imperativos más básicos y esenciales del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786. Huelga aclarar que este es el más riguroso estándar probatorio.

Los elementos del delito imputado, así como la conexión del acusado con los hechos delictivos deben establecerse para cumplir con este quantum probatorio. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 905 (2024); *Pueblo v. Nieves Cabán*, 201 DPR 853, 878 (2019); *Pueblo v. Santiago et al.*, 176 DPR 133, 142 (2009); *Pueblo v. Irizarry*, *supra,* pág. 787; *Pueblo v. Acevedo Estrada,* 150 DPR 84, 99 (2000). Aclaramos que lo previo no implica que deba destruirse toda duda posible, sea especulativa o imaginaria, ni que la culpabilidad del acusado tenga que establecerse con certeza matemática. *Pueblo v. Feliciano*, 150 DPR 443, 447 (2000); *Pueblo v. Rosario Reyes,* 138 DPR 591, 598 (1995); *Pueblo v. Pagán, Ortiz,* 130 DPR 470, 480 (1992); *Pueblo v. Bigio Pastrana,* 116 DPR 748, 761 (1985).

La duda razonable que justifica la absolución del acusado es "el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación." *Pueblo v. Irizarry*, supra, pág. 788. Es

decir, la duda razonable no es otra cosa que "la insatisfacción de la conciencia del juzgador con la prueba presentada". *Id.*

Ahora bien, nuestro ordenamiento jurídico establece que un hecho puede establecerse mediante evidencia directa o circunstancial. Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110. La precitada Regla dispone, además, que la prueba directa es aquella "que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente". Por otro lado, la misma Regla establece que la prueba circunstancial "tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia".

Con relación a la prueba testifical, tanto la precitada Regla, como nuestra jurisprudencia, ha sido clara en que aquel testimonio al que el juzgador le merezca entero crédito será suficiente para probar un hecho. *Id*; *Pueblo v. Chévere Heredia*, 130 DPR 1, 19-21 (1995). Es por esta deferencia a la credibilidad que otorgue el juzgador de los hechos a un testigo, que aun si se encontrara falsedad en parte sus declaraciones, no será necesario descartar el resto de su testimonio. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 260 (2011); *Pueblo v. Pagán Ortiz*, 130 DPR 470, 483 (1992).

Por otra parte, es norma reiterada que la apreciación que hace un juzgador de los hechos y de la prueba que desfila en el juicio es una cuestión mixta de hecho y de derecho. *Pueblo v. González Román*, 138 DPR 691, 708 (1995); *Pueblo en interés del menor F.S.C.,* 128 DPR 931, 942 (1991). Por esto, la misma es revisable en apelación. *Id.* Por otro lado, tal apreciación incide sobre la suficiencia de la prueba, capaz de derrotar la presunción de inocencia, lo que puede convertir este asunto en uno de derecho.

Nuestro Tribunal Supremo ha enfatizado, en ocasiones repetidas, que la valoración y el peso que el juzgador de los hechos le imparte a la prueba y a los testimonios presentados ante sí *merecen respeto y confiabilidad* por parte de este Tribunal Apelativo. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991); *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 551 (1974). Como corolario de lo anterior, *salvo que se demuestre la presencia de error manifiesto, pasión, prejuicio o parcialidad*, el Foro Apelativo no debe intervenir con la evaluación de la prueba hecha por el juzgador de hechos. *Pueblo v. Acevedo Estrada*, supra, págs. 98-99; *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991).

No obstante, podemos intervenir con tal apreciación cuando de una evaluación minuciosa surjan "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 551. Ante la inconformidad que crea la duda razonable, los tribunales apelativos, aunque no están en la misma posición de apreciar la credibilidad de los testigos, sí tienen, al igual que el Foro Apelado, "no sólo el derecho [,] sino el deber de tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry*, supra, pág. 790; *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 552.

Por ende, el Foro Primario está en mejor posición para aquilatar la prueba testifical que ante sí se presenta, ya que es quien tiene ante sí a los testigos cuando declaran. *Pueblo v. Negrón Ramírez,* supra, pág. 910; *Pueblo v. González Rivera*, 207 DPR 846, 848 (2021); *E.L.A. v. P.M.C.,* 163 DPR 478, 490 (2004); *Argüello v. Argüello,* 155 DPR 62, 79 (2001). El juzgador de los hechos es quien goza del privilegio al poder apreciar el comportamiento del testigo, o el 'demeanor', lo que le permite determinar si le merece credibilidad o no. Este es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos,

contradicciones, manerismos, dudas y vacilaciones. *Pueblo v. Cruz Rosario*, 204 DPR 1040, 1057-1058 (2020); *Pueblo v. Arlequín Vélez,* supra, pág. 147; *Pueblo v. Toro Martínez*, 200 DPR 834-857-858 (2018); *Pueblo v. García Colón I*, supra, pág. 165; *Pueblo v. Viruet Camacho*, 173 DPR 563, 584-585 (2008). Resulta importante destacar que "el testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio". *Pueblo v. Toro Martínez*, supra, pág. 860.

Destacamos que, luego que recae un veredicto de culpabilidad, *permea una presunción de corrección sobre el dictamen.*

En resumidas cuentas, la duda razonable es aquella duda fundada que surge como producto de la consideración justa e imparcial de la totalidad de la evidencia o de la falta de prueba suficiente, por lo que "[n]o es una duda especulativa, imaginaria o cualquier duda posible". *Pueblo v. Cruz Granados*, 116 DPR 3, 21 (1984). "[T]enemos que concluir que el concepto de duda razonable tiene una similitud con el amor: es un tanto difícil de definir y describir pero podemos reconocerlo cuando está frente a nosotros". *Pueblo v. Soto Gonzalez*, 149 DPR 30, 43 (1999).

### D. Juicio por Jurado

El trato marcado por deferencia hacia las determinaciones de los jurados se remonta al Siglo XVIII, cuando el derecho a juicio por jurado del "common law" inglés, fue ratificado mediante la aprobación de la Sexta Enmienda de la Constitución de los Estados Unidos de América. *Peña-Rodríguez v. Colorado*, 580 US 206, 231 (2017).

Las decisiones que toma un jurado son protegidas por el conocido "no impeachment rule", el cual fue aplicado por primera vez en el caso inglés del año 1785, *Vaise v. Delaval,* 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785). En este caso, se les impidió a los

convictos del caso a cuestionar los procesos deliberativos del jurado. Las cortes estadounidenses fueron adoptando esta regla poco a poco, y hoy día, está consagrada en la Regla 606 de las Reglas de Evidencia Federal, 28 USCA.

Por otro lado, *en Puerto Rico*, el derecho a ser juzgado por un Jurado está consagrado en el Artículo II, Sección 11 de nuestra Constitución. Así está también consolidado estatutariamente, en la Regla 111 de las Reglas de Procedimiento Criminal, supra. Este cuerpo, constituido de doce (12) personas de la comunidad, está encargado de recibir y evaluar la prueba presentada durante un juicio, y finalmente adjudicarla. Nuestro Tribunal Supremo describió de manera asertiva las funciones de este ensamblaje de juzgadores de la siguiente manera:

> La opción de un juicio ante un panel de jurados implica conferir a éstos la administración de la justicia, esto es la determinación final sobre culpabilidad. El Jurado, compuesto por una muestra representativa de la comunidad del acusado tiene como encomienda evaluar la prueba, recibir instrucciones sobre el derecho aplicable, deliberar en secreto y rendir un veredicto final. De entender el Jurado que el acusado incurrió en responsabilidad criminal por los hechos que se le imputan deberá determinar el delito específico o el grado del mismo, por el cual éste deberá responderle a la sociedad.
>
> *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299, 337-338 (1991).

Nuestro Máximo Foro ha sido consistente: las determinaciones de un Jurado merecen y demandan credibilidad, siempre que las mismas no estén vetadas de error manifiesto, pasión, perjuicio o parcialidad. *Pueblo v. Negrón Ramírez,* supra, pág. 912; *Pueblo v. Hernández Noble,* 210 DPR 850, 864 (2022); *Pueblo v. Acevedo Estrada,* supra, págs. 98-99; *Pueblo v. Colón Castillo,* 140 DPR 564, 580 (1996); *Pueblo v. Rosario Reyes,* 138 DPR 591, 598 (1995); *Pueblo v. Rivera Robles,* 121 DPR 858, 869-870

(1988); *Pueblo v. Cabán Torres*, 117 DPR 645, 653-654 (1986). En ausencia de tales circunstancias, la jurisprudencia impide la intervención en apelación. *Id.* Ello es así puesto que "[e]l jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba. Son estos quienes normalmente están en mejor condición de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos." *Pueblo v. Ruiz Ramos*, 125 DPR 365, 400-401 (1990), Véase, además, *Pueblo v. Rosario Reyes,* supra, págs. 598-599.

Por tanto, las determinaciones del juzgador de los hechos no deben ser descartadas arbitrariamente ni deben sustituirse por otro criterio a menos que de la prueba admitida surja que no existe base suficiente para apoyarlas. *Pueblo v. Maisonave Rodríguez,* 129 DPR 49, 62 (1991). Es decir, solo debemos apartarnos de esta deferencia cuando la apreciación de la prueba se alejó demasiado de la prueba presentada o cuando la realidad no concuerda con la evidencia sometida durante el juicio, o ésta resultare increíble o imposible. *Pueblo v. Acevedo Estrada*, supra, págs. 98-99.

### E. Evidencia Fotográfica

Nuestro Tribunal Supremo ha reconocido la fotografía como prueba documental válida, especialmente cuando estas son presentadas con el fin de corroborar el testimonio de un testigo. *Pueblo v. Rivera Romero*, 83 DPR 471, 483 (1961); *Pueblo v. Márquez,* 67 DPR 326, 335 (1947).

### a. Evidencia Demostrativa e Ilustrativa

Al hablar de evidencia demostrativa se refiere a evidencia perceptible por los sentidos. E.L. Chiesa Aponte, *Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales*, República Dominicana, Ed. Corripio, 1998, T. II, págs. 1049-1056.

Es decir, prueba de naturaleza tangible, visible o audible que transmite al juzgador de hechos una impresión de primera mano.

Este tipo de evidencia demostrativa se clasifica en "evidencia real" y "evidencia ilustrativa". E.L. Chiesa, *Reglas de Evidencia de Puerto Rico 2009*, Estados Unidos de América, Publicaciones JTS, Ed. Luiggi Abraham, 2009, pág. 324. El propósito de la ilustrativa es "únicamente para enseñar, instruir, representar o hacer más comprensible" el testimonio de un testigo mediante fotografías, videos, croquis, inspecciones oculares, entre otras. *Pueblo v. Nazario Hernández*, 138 DPR 760, 774 (1995).

Por otro lado, la evidencia demostrativa real, "juega un papel central y directo en el asunto que sea objeto de la controversia". *Id.* Debido a estas esenciales diferencias, "[l]a autenticación es diferente cuando la evidencia demostrativa es real o ilustrativa. Hay mucho más rigor en la evidencia real, pues hay que satisfacer [el requisito de] mismidad [establecido] en la Regla 901(A)". E.L. Chiesa, *Reglas de Evidencia de Puerto Rico 2009*, op.cit., pág. 325. Dicha Regla 901(A) dispone que "[e]l requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene".

Ahora bien, uno de los tipos de prueba que pueden ser autenticados en evidencia como prueba demostrativa o ilustrativa *son las fotografías.* Las mismas constituyen evidencia demostrativa real si su contenido específico de estas se encuentra en controversia. Rolando Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño, Nuevas Reglas de Evidencia,* 2010, 3ra. ed., Puerto Rico, Ediciones SITUM, 2010, pág. 558. Para estos casos, es necesario que la misma sea presentada a través del fotógrafo de esta. Sin embargo, *si la foto es presentada en evidencia con el fin de*

*ilustrar un hecho o circunstancia alegada, es suficiente que se haga mediante un testigo que pueda establecer que lo ilustrado en la fotografía refleja sinceramente el hecho o circunstancia alegada. Id.*

### b. Admisibilidad y Pertinencia

Sabido es que en nuestro sistema de Derecho Probatorio el concepto de pertinencia es esencial. La Regla 401 de Evidencia, 32 LPRA Ap. VI, R. 401 define la evidencia pertinente como "aquélla que tiende a hacer la existencia de un hecho, que tiene consecuencias para la adjudicación de la acción, más probable o menos probable de lo que sería sin tal evidencia. Esto incluye la evidencia que sirva para impugnar o sostener la credibilidad de una persona testigo o declarante".

Ahora bien, la regla general codificada en la Regla 404 de Evidencia, supra, que toda "evidencia pertinente es admisible excepto cuando se disponga lo contrario por imperativo constitucional, por disposición de ley o por estas Reglas. La evidencia no pertinente es inadmisible." En relación a ello, el profesor Chiesa señala que, si la evidencia ofrecida por una parte no es pertinente, se excluye sin ulterior consideración. Ernesto Chiesa Aponte, *Reglas de Evidencia Comentadas*, Ediciones SITUM, 1era edición, 2016, pág. 73. Por esto último es que se afirma que "[e]l tribunal no tiene discreción para admitir evidencia no pertinente (Regla 402) ni admitir evidencia a la que se aplica una regla de exclusión, como materia privilegiada o prueba de referencia inadmisible." *Id.* págs. 74-75.

Por otra parte, la Regla 403, supra, establece que evidencia pertinente puede ser excluida cuando su valor probatorio queda sustancialmente superado por cualquiera de estos factores: (a) riesgo a causa perjuicio indebido, (b) riesgo a causar confusión, (c) riesgo de causar desorientación en el jurado, (d) dilación indebida de los procedimientos, y (e) innecesaria presentación de prueba

acumulativa. El Tribunal Supremo ha reconocido que el fundamento del peligro de causar perjuicio indebido es el factor más invocado de la Regla 403, supra. *Pueblo v. Santiago Irizarry*, 198 DPR 35, 44 (2017); *Pueblo v. Ortiz Pérez*, 123 DPR 216, 228 (1989). En términos generales se trata de prueba que puede conducir a un resultado erróneo, apelando meramente -y aunque no únicamente- a los sentimientos y a la emoción. Sin embargo, hay que recordar, que particularmente en la litigación criminal en ocasiones es preciso recrear ante los ojos del jurado situaciones desagradables que deben ser legítimamente objeto de prueba. No toda evidencia que pueda conmover el ánimo del jurado constituye materia a ser excluida. *Id.* Lo esencial en este tipo de casos es que el perjuicio sea "indebido", pues en nuestro sistema cuando se presenta una prueba lo que se busca, precisamente, es causarle perjuicio a la parte contraria. Ernesto Chiesa, *Reglas de Evidencia Comentadas,* op. cit., pág. 76.

Así pues, aun cuando la regla general es que toda evidencia pertinente es admisible, nuestro ordenamiento jurídico reconoce la discreción del tribunal para excluir evidencia pertinente cuyo valor probatorio queda superado por algunos de los factores enumerados en la Regla 403 antes citados. *Pueblo v. Santiago Irizarry,* supra, pág. 44.

Entre estos factores se encuentra cuando la evidencia constituya en efecto, prueba acumulativa. Se considera prueba acumulativa aquella que se utiliza para establecer un hecho que ha sido establecido satisfactoriamente, dado que "ya se [ha] presentado evidencia tendente a probar" el hecho consumado. *First Bank of P.R. v Inmob. Nac. Inc.*, 144 DPR 901, 912-913 (1998). Así que, el postulado filosófico-práctico de la regla es que, en atención a la economía procesal, se excluye la prueba acumulativa porque a la luz de toda la demás prueba admitida, "su valor probatorio resulta mínimo frente a su efecto inflamatorio y perjudicial." *Pueblo v. Rivera*

*Nazario*, 141 DPR 865, 895 (1993). Véase, además, *Izagas v Santos v. Family Drug Center*, 182 DPR 463, 482-483 (2011).

Las discusiones sobre la admisibilidad y pertinencia de *las fotografías*, ha conducido a nuestro Alto Foro a expresarse específicamente, y en gran manera relevante al caso de autos, sobre las fotos de cadáveres. En lo relevante, ha reconocido la admisibilidad de las fotografías de un cadáver, cuando las mismas no sean presentadas con el propósito de impresionar o influenciar al juzgador contra el acusado. *Pueblo v. Rodríguez Colón*, 95 DPR 614, 617 (1967). Nuestro Tribunal Supremo ha sostenido la validez y admisibilidad de estas fotos con el fin de ilustrar las lesiones producidas en la comisión de un delito o las características del lugar de los hechos. *In re Colton Fontan*, 128 DPR 1, 95-96 (1991); *Pueblo v. Lebrón González*, 113 DPR 81, 101 (1982); *Pueblo v. Rodríguez Colón*, supra, págs. 617-618; *Pueblo v. Pacheco Stevenson*, 83 DPR 842, 848 (1961); *Pueblo v. Rivera*, 69 DPR 538, 541 (1949); *Pueblo v. Zayas Ortiz*, 65 DPR 538, 541 (1946); *Pueblo v. Márquez*, 67 DPR 326, 335 (1947). En fin, son útiles para comprobar la veracidad de las percepciones visuales testificadas por los testigos. *In re Colton Fontan*, supra, pág. 96.

En un ejercicio reflexivo, nuestro Alto Foro advirtió contra las presunciones de sensibilidad hacia el Jurado. Amonestó a los foros judiciales en contra de mantener a los jurados "aislados de los hechos que precisamente van a juzgar. No podemos presumir que sean personas de sensibilidad extrema, que el menor contacto con cualquier incidente, en casos de asesinato o de cualquier otro delito que están juzgando, le afecte su ánimo en tal forma que le impida rendir un veredicto imparcial. Ellos deben conocer todo lo relacionado con el caso que juzgan para estar en mejores condiciones de rendir un veredicto. Se ha sostenido que, fotografías

como las que objeta el apelante, son admisibles". *Pueblo v. Rivera Romero*, 83 DPR 471, 483 (1961).

### F. Embriaguez

Desde tiempos inmemoriales, la embriaguez ha sido una conducta y/o patología enérgicamente censurada moral y jurídicamente.[123] Sin embargo, el *Derecho Romano Clásico* amortiguó el duro escrutinio de la embriaguez y de aquellos que incurrían en ella. La evolución jurídica de este tema, en el derecho francés y el de países como Rusia, Polonia, Holanda y Bélgica, incluso, omitieron consignar de manera expresa las circunstancias de la embriaguez en sus códigos penales.

Sin embargo, el *Código Penal de España* del año 1822 y los subsiguientes, expresaron que "la embriaguez voluntaria... no será nunca disculpa del delito... no por ella disminuirá la pena respectiva".[124] Es decir, adoptaron una postura punitiva ante la embriaguez. En otra vertiente, el *derecho anglosajón* se mostró extremadamente riguroso desde sus comienzos con lo relacionado al tema en cuestión. Sobre este fundamento, se estableció la doctrina *"drunkness is no excuse"* del derecho penal Angloamericano.[125]

Ahora bien, con relación a *Puerto Rico* y su desarrollo legislativo al respecto, es necesario remontarnos al 13 de abril de 1916, con la aprobación de la Ley Número 75, la cual, en su Sección 5(1) prohibió contundentemente operar vehículos de motor en un estado de intoxicación. Posteriormente, el 27 de abril de 1942, la Ley Número 75 fue derogada por la Ley Numero 55. En su Artículo 4(k) se dispuso que "ninguna persona podrá manejar un vehículo de

---

[123] Embriaguez, *Nueva Enciclopedia Jurídica*, Tomo VIII, Barcelona, Editorial Francisco Seix, S.A. 1956.
[124] Embriaguez, op. cit., pág. 295.
[125] Wharton, *Criminal Law,* 12 ed. Rochester, New York, 1932, Title I, pág. 95.

motor mientras estuviese en estado de embriaguez".[126] Unos pocos años más tarde, esta disposición fue enmendada mediante el Artículo 13 de la Ley Número 279 del 5 de abril de 1946. Luego de esta enmienda, disponía el estatuto que "*[t]oda persona que en estado de embriaguez maneje un vehículo de motor, incurrirá en delito menos grave...* se le castigará con una multa... o cárcel por un término...".

Ahora bien, para la década del 1950, existía una situación creciente en Puerto Rico referente a los accidentes automovilísticos en las carreteras del país, por lo que la Legislatura se propuso impulsar legislación que ayudara, mediante métodos científicos, determinar el estado de embriaguez de las personas. *Pueblo v. Tribunal Superior*, 84 DPR 392, 393-394 (1962). Por ello, el 29 de junio de 1954 se aprobó la Ley Número 95, con el interés de reconciliar el interés de la comunidad frente a los derechos individuales del ciudadano. Mediante esta, se insertó un sistema de exámenes químicos para determinar el porciento de intoxicación alcohólica de los conductores, algo que ya en los Estados Unidos de América se había sostenido constitucionalmente.

Poco después, se aprobó la Ley Número 141 de 20 de julio de 1960, la cual estuvo vigente por espacio de cuarenta (40) años, y recogió la redacción de la Sección 11-902 del Código Uniforme de Vehículos de Motor Federal. Esta Ley expuso los pormenores procesales para imputar de delito a un individuo que condujera un vehículo bajo los efectos de bebidas embriagantes. Así, dispuso que si se hallare .15% de alcohol en la sangre de un acusado, se presumirá que estaba bajo los efectos de bebidas embriagantes. Sección 5-801, Ley Número 141, 9 LPRA ant. sec. 1041. Estableció, además, que la pena para el convicto del delito por conducir

---

[126] Este artículo es una traducción literal al idioma español.

intoxicado no sería menor de diez (10) días, ni mayor a un (1) año, de reclusión. Sección, 5-802, Ley Número 141, *supra*, ant. sec. 1042.

La introducción de los métodos científicos en la prueba de embriaguez produjo un aumento sustancial en la litigación de estos casos. En la década de 1960, se cuestionó la validez de estos asuntos, por lo que, en *Pueblo v. Tribunal Superior*,[127] nuestro Tribunal Supremo expresó que "la ocurrencia de accidentes fatales" habían creado una "necesidad pública" que catalogó como "emergencia civil". Por todo lo cual, *sostuvo la validez constitucional* de estos procesos científicos en casos de embriaguez, concluyendo que "el interés público prevalece sobre el interés del ciudadano". Id., pág. 841. Un año más tarde, nuestro Alto Foro ratificó este postulado en *Pueblo v. Díaz Torres*, 89 DPR 720 (1963).

### a. Ley de Tránsito (Ley 22-2000)

En la actualidad, la normativa que encausa los asuntos relevantes a la embriaguez se encuentra en la Ley de Vehículos y Tránsito de Puerto Rico, en adelante. Ley de Tránsito, Ley Núm. 22-2000, 9 LPRA 5001 *et seq*. Con la adopción de este estatuto, se derogó la Ley Número 141 de 20 de julio de 1960, la cual, luego de cuarenta (40) años de múltiples enmiendas, había quedado obsoleta, con lenguaje repetitivo, redacción confusa y desorganizada y disposiciones contradictorias. Por lo anterior, en la Exposición de Motivos de la Ley de Tránsito el legislador expuso la necesidad de adoptar un estatuto que buscara "**fortalec[er] las sanciones** en cuanto a aquellas violaciones de ley que representan grave riesgo a la seguridad pública". *Pueblo v. Martínez Landrón*, 202 DPR 409, 417-418 (2019); *Pueblo v. Caraballo Borrero*, 187 DPR 265, 274 (2012); *Pueblo v. Montalvo Petrovich*, 175 DPR 932, 944 (2009);

---

[127] 86 DPR 834 (1962).

*Pueblo v. Figueroa Pomales,* 172 DPR 403, 422-423 (2007). (Énfasis suplido).

En su **Artículo 7.01**, el referido cuerpo de leyes reitera la política pública del Gobierno de Puerto Rico al expresarse de la siguiente manera:

> Constituye la posición oficial y política pública del Gobierno de Puerto Rico que el manejo de vehículos en las vías públicas bajo los efectos de bebidas embriagantes, drogas o sustancias controladas *constituye una amenaza de primer orden a la seguridad pública* y que los recursos del Estado irán dirigidos a combatir, en la forma más completa, decisiva y enérgica posible, con miras a la pronta y total erradicación, *de esta conducta antisocial y criminal que amenaza las vidas y propiedades de todos los ciudadanos,* así como la tranquilidad y la paz social.

> Ley de Tránsito, supra, sec. 5201.
> (Énfasis nuestro).
> *Pueblo v. Figueroa Pomales*, supra, pág. 423.

En lo que concierne al presente caso, el **Artículo 7.02** dispuso que es:

> [I]legal per se, que cualquier persona de veintiún (21) años de edad, o más, conduzca o haga funcionar un vehículo de motor, cuando su contenido de alcohol en su sangre sea de ocho centésimas del uno por ciento (0.08%) o más.

> Artículo 7.02, Ley de Tránsito, supra, sec. 5202.

Así, todo el que viole las disposiciones del precitado Artículo, incurrirá en delito menos grave. Artículo 7.04, Ley de Tránsito, supra, sec. 5204.f.

Relevante al caso de marras, el **Artículo 7.06** dispone que:

> Si a consecuencia de la violación a lo dispuesto en los Artículo 7.01, 702 o 7.03 de esta Ley, un conductor causare grave daño corporal a un ser humano, incurrirá en delito grave con pena de cinco (5) años de reclusión, pena de multa no menor de mil (1,000) dólares ni mayor de cinco mi (5,000) dólares y pena de restitución.
> [...]

**Si a consecuencia de la violación a lo dispuesto en los Artículo 7.01, 7.02 o 7.03 de esta Ley, un conductor le ocasiona la muerte a otra persona, incurrirá en delito grave y se le impondrá una pena de reclusión por un término fijo de quince (15) años.**

Ley de Tránsito, supra, sec. 5206.
(Énfasis nuestro).

Por su parte, el **Artículo 7.08** de la Ley de Tránsito, supra, sec. 5208, atiende el asunto sobre la sentencia suspendida en las penas bajo el Capítulo VII de esta Ley. En su aprobación original, el texto del precitado Artículo establecía unos criterios para que las personas convictas bajo este acápite pudieran aprovecharse del beneficio de la sentencia suspendida. Sin embargo, las enmiendas introducidas a la Ley de Tránsito, supra, mediante la Ley 24-2017, cambió el texto del Artículo 7.08. Dispuso, de esta manera que:

El Tribunal podrá suspender los efectos de la sentencia de reclusión impuesta bajo este Capítulo con excepción de convicciones bajo el Artículo 7.06 *el cual no tendrá el beneficio de una sentencia suspendida.*

*Id.*
(Énfasis nuestro).

Es decir, las personas convictas por conducir en estado de embriaguez, que ocasionen grave daño corporal o *la muerte a otros* no podrán ser elegibles para servir su condena bajo el privilegio de sentencia suspendida.

Resulta meridianamente claro que el trato legislativo y jurisprudencial del derecho puertorriqueño en el tema de la embriaguez como corolario de delito, ha sido uno serio y de graves repercusiones legales. Varios desarrollos estatutarios resaltan esta realidad. A modo de ejemplo destacamos que, a diferencia de la actual Ley 22-2000 de Tránsito, la Ley anterior, Ley Número 141 del año 1960, no establecía como "delito *per se*" la concentración de alcohol en la sangre de quien condujera intoxicado un vehículo en

estado de embriaguez. La Ley Número 141, supra, solo reconocía una "presunción" de embriaguez en estos casos. *Pueblo v. Figueroa Pomales*, supra, pág. 424. Por otro lado, vemos como la Legislatura ha disminuido el porcentaje de alcohol en el organismo de una persona que conduzca un vehículo de motor, para considerarlo como delito. También es evidente que a través de estos últimos años han aumentado las penas para quienes incurran en esta conducta. Finalmente, tan reciente como en el año 2017, la Ley de Tránsito, supra, fue enmendada para reiterar que imputados de conducir en estado de embriaguez provocaren grave daño corporal o muerte, no puedan beneficiarse de la sentencia suspendida. Ley 24-2017, supra. Estas instancias son evidencia de que nuestro ordenamiento jurídico ha asumido una postura cada vez más severa y punitiva sobre la embriaguez, y los resultados de conducir en este estado.

Finalmente, por los hechos particulares del caso de autos, observamos lo dispuesto en el **Artículo 7.09** de la Ley en cuestión:

> (c) Se considerará que toda persona que transite por las vías públicas de Puerto Rico conduciendo un vehículo, un vehículo de motor, un vehículo pesado de motor o un vehículo todo terreno habrá prestado su consentimiento para someterse a la prueba de campo estandarizada de sobriedad (Standard Field Sobriety Test) así como al análisis químico o físico de su sangre, o de su aliento o de cualquier sustancia de su cuerpo, para los fines que se expresan en este Capítulo.
> [...]
> (d) ...
> (e) Además de lo dispuesto en el inciso (c) de este Artículo, cualquier agente del orden público podrá requerirle a cualquier persona que esté conduciendo o haciendo funcionar un vehículo de motor que se someta a cualquiera de las pruebas iniciales, ya sea la prueba de campo estandarizada de sobriedad (Standard Field Sobriety Test) y/o la prueba de aliento y/o cualquier otra prueba establecida. Estas pruebas serán practicadas en el lugar de la detención, salvo que por circunstancias de seguridad no se pueda realizar en el lugar de la detención, en cuyo caso se

podrá realizar en un lugar cercano a la detención y/o en el cuartel más cercano, si dicho agente:

(1) Tiene motivo fundado para sospechar que la persona ha ingerido alcohol o ha utilizado sustancias controladas; o

(2) Si ocurre un accidente y la persona se hallaba conduciendo uno de los vehículos involucrados en el accidente.

Artículo 7.09(e) de la Ley de Tránsito, supra, sec. 5209.

Es decir, un agente del orden público que intervenga con un conductor está autorizado a realizar una prueba de alcohol por virtud de la normativa jurídica relevante a los motivos fundados. *Pueblo v. Caraballo Borrero*, 187 DPR 265, 273 (2012). Sin embargo, al amparo de la Ley de Tránsito, supra, podrá requerir la misma siempre que ocurre un accidente, y la persona intervenida se encontraba manejando un vehículo involucrado en el mismo. *Pueblo v. Álvarez de Jesús*, 2024 TSPR 87, 214 DPR ___ (2024).

## III.

En su apelación, Borges Domenech recurre ante nos solicitando que revisemos y revoquemos la *"Sentencia"* dictada en su contra el 6 de marzo de 2023. En su petitorio, la apelante nos hace cinco (5) señalamientos de error. Algunos de estos, los discutiremos en conjunto. Luego de reseñar los hechos pertinentes al caso de marras, y esbozar la normativa jurídica aplicable, adjudicamos.

En su *primer, segundo y tercer señalamiento de error*, la apelante argumenta que el Foro Apelado se equivocó al admitir como prueba en el juicio la prueba de alcohol que le hicieron, las fotos del lugar de los hechos y las fotos de las autopsias de las víctimas fenecidas. *No le asiste la razón.*

Respecto a la prueba de alcohol, la apelante sostiene que la prueba de alcohol no era admisible como evidencia, ya que el Agente

Suárez Borrero ordenó la misma como alegada medida protocolar. Arguye que esto no evidencia la falta de motivo fundado para realizar la prueba. Sin embargo, conviene repasar el contexto de esta parte del testimonio del agente:

> Además, lo observo *que tenía cuando la lengua pesada,* cuando me estaba indicando el nombre y la dirección. Eh, la observé también que *tenía un fuerte olor al alcohol, en sus ¿verdad? Y también lo observé que tenía, se tambaleaba* un poquito. Eh, le pregunté, ¿verdad? este que *tenía un motivo fundado para creer que estaba en estado de embriaguez.* Y además también que, *por ser un accidente grave y fatal, como medida protocolar, tenemos que llevarla a hacer una prueba de embriaguez.* Ahí procedí. Le leí las advertencias de ley.[128]

(Énfasis suplido).

Lo cierto es que precisamente esta parte del testimonio del Agente Suárez Borrero evidencia el motivo fundado. Surge que este notó en Borges Domenech varias características, como el fuerte olor a alcohol, que imparten el motivo fundado necesario para someter a alguien a una prueba de alcohol. Explicarle a Borges Domenech que debía llevarla para realizarle una prueba de aliento, fue el resultado directo de las características consistentes con la embriaguez que percibió en ella. Más allá de una medida protocolar, este era el proceder que le correspondía al agente, conforme a la Ley. *Pueblo v. Álvarez de Jesús,* supra.

Ciertamente, al amparo del Artículo 7.09 de la Ley de Tránsito, supra, previamente reseñado, el testigo estaba autorizado a realizar la prueba. Esto último, ya que se encontraba investigando un accidente de tránsito, en el que estaba involucrado el vehículo de motor que manejaba la apelante.

Por otro lado, la apelante sostiene que el TPI-Caguas se equivocó al admitir en el desfile de la prueba fotografías sobre los cadáveres, por ser las mismas inflamatorias y acumulativas. Sin

---

[128] Transcripción *digital* de la prueba oral, págs. 32-33.

embargo, como establecimos previamente, la prueba acumulativa es aquella que resulta innecesaria, por haberse ya establecido, sin la necesidad de esta, el hecho alegado. No obstante, mediante el testimonio de varios testigos, especialmente el de la patóloga forense, se testificó sobre los traumas físicos sufridos por los occisos. Las fotografías fueron prueba ilustrativa de ello.

Con relación al argumento inflamatorio sobre las mismas, nos remitimos a lo esbozado en la sección previa. Nuestro Alto Foro ha establecido, en esencia, que si el valor probatorio debe superar el potencial efecto inflamatorio. Colegimos que en el caso de autos, ese riesgo quedó superado por la importancia de las fotos. Los testigos de la Uniformada, el señor Claudio Claudio y la perito testificaron sobre el resultado del incidente sobre los cuerpos de las tres (3) víctimas. Las fotos de los finados y de Juan Quiñones son prueba ilustrativa de todos estos testimonios. A la luz de las acusaciones hechas a la apelante, era imperativo para el Ministerio Público establecer el grave daño corporal sufrido por Juan Quiñones, y la muerte de María Fonseca y Agustín Oquendo.

Borges Domenech alega que la admisión de estas fotos determinó el fallo condenatorio. Sin embargo, huelga aclarar que "[e]l mero hecho de que una fotografía pueda impresionar desfavorablemente al Jurado no justifica su exclusión". *Pueblo v. Echevarría Rodríguez,* supra, págs. 351-352; *Pueblo v. Rodríguez Colón,* supra, pág. 617.

En su *cuarto señalamiento de error*, la apelante arguye que el TPI-Caguas se equivocó al no desestimar los cargos en su contra, por violación a su derecho a juicio rápido. Alega que los términos de juicio rápido comenzaron a cursar en el momento en que fue arrestada, el 23 de diciembre de 2018, la cual es la fecha de los hechos del caso. Entiende Borges Domenech que desde esa fecha, estuvo sujeta a responder, por lo que el Ministerio Público incumplió

con los términos de la Regla 64(n) de Procedimiento Criminal, supra. *No le asiste la razón.*

Resulta incuestionable la inexistencia de violación al derecho a juicio rápido levantados por la apelante en las distintas etapas del proceso criminal. Como esbozáramos previamente, los términos de juicio rápido se activan cuando una persona está *sujeta a responder*. Nuestra jurisprudencia ha interpretado que esto último ocurre cuando se cita a un individuo ante un magistrado, cuando se determina causa probable para arrestar o se detiene a alguien acusado de cometer un delito. *Pueblo v. García Colón*, supra. El TPI-Caguas en su *"Resolución"* del 10 de marzo de 2021, correctamente expresó:

> El alegado "arresto" del 23 de diciembre de 2018, desprovisto del elemento objetivo de privación de libertad y en ausencia de una citación, se redujo a una intervención que no tuvo el efecto de poner a la parte apelada en la situación de tener que responder por un delito público.

A tenor con los antes expuesto, colegimos que el cuarto error no se cometió.

Finalmente, en su *quinto señalamiento de error*, expone Borges Domenech que el Foro Primario erró al encontrarla culpable, ya que no se estableció su culpabilidad más allá de duda razonable, a la luz de la prueba presentada por el Ministerio Público. *No le asiste la razón.*

La apelante señala que el testimonio de Claudio Claudio establece duda razonable a su favor. Arguye, entre otros, que este testigo declaró estar con la víctima Juan Quiñones, pero que este último, sin embargo, no lo mencionó en su testimonio. La apelante propone que el testimonio de Claudio Claudio es un montaje en beneficio de su amigo, Juan Quiñones, con el fin de perjudicarla.

Aunque los argumentos de la apelante no nos convencen, aun si este Tribunal les diera entera credibilidad, durante el juicio

testificaron diez (10) testigos adicionales, y desfiló prueba documental y demostrativa. Es nuestra apreciación que, aun sin el testimonio de Claudio Claudio, el Ministerio Público estableció la culpabilidad de Borges Domenech más allá de duda razonable. Veamos.

Todos los testimonios, con excepción de los peritos, corroboran que el 23 de diciembre de 2018, hubo un accidente de tránsito frente a la Lechonera los Compadres en el Municipio de San Lorenzo, en horas de la noche. Todos los testimonios y la prueba demostrativa desfilada corroboran que, a consecución de este accidente, fallecieron dos (2) sexagenarios y otra persona resultó gravemente herida.

Ahora bien, los testimonios de los agentes de la Policía de Puerto Rico corroboran que la persona que conducía el vehículo que impactó a las personas afectadas fue Borges Domenech. La prueba de alcohol, realizada conforme a derecho y debidamente admitida como evidencia, y la testifical de los agentes, establecen que la apelante se encontraba en estado de embriaguez.

Por otro lado, nos señala Borges Domenech que las autopsias de los finados indicaron que estos se encontraban en estado de embriaguez, en la vía pública, en contravención a la Ley de Tránsito, supra, al momento de los hechos. En su alegato, citan en apoyo el Informe de Accidente de Tránsito preparado por el Agente Suárez Borrero, en donde indica que "[e]stas negligencias dieron motivo y lugar a que el vehículo en cuestión impactara con su parte delantera a un 1er peatón [...]". Además, sostiene que en añadidura a esto, se suma que el lugar era sumamente oscuro. Alega que es por esto último que impactó al primer peatón, quien obstruyó su visión cuando cayó en su cristal delantero, e impacto a los otros dos (2).

Los testimonios de todos los que allí estuvieron presentes, y las fotografías admitidas como evidencia, comprueban que el área,

aunque oscura, se beneficiaba de las luces del restaurante la Lechonera los Compadres. Para que un argumento como el de la insuficiencia en el alumbrado prospere, requiere que la defensa de Borges Domenech implique que las luces de su vehículo no funcionaran adecuadamente. Nada de esto se trajo en el juicio. La apelante había manejado de Cerro Gordo a la casa de su pareja y se encontraba de camino a la suya. Si el asunto medular de esta tragedia recayera, como parecería indicar la apelante, sobre el alumbrado del lugar y no su estado de intoxicación, las mismas luces que alumbraron el trayecto recorrido hasta el lugar de los hechos debieron ser suficientes para ver a los peatones que atropelló.

Ahora bien, con relación al estado de embriaguez de los occisos, ¿qué exactamente intenta argüir Borges Domenech? ¿Que la conducta ilegal de las víctimas aminora la suya? El que las víctimas de este caso hayan estado en la vía pública, bajo los efectos del alcohol, en nada cambia el hecho de que Borges Domenech se encontraba conduciendo un vehículo de motor, a alta velocidad, con un .11% de alcohol en su organismo.

Lo cierto es que el Foro Apelado y los distinguidos señores del Jurado, no solo escucharon estos testimonios, sino que aquilataron la credibilidad que le merecía a cada uno. Justipreciamos que el TPI-Caguas no incurrió en perjuicio, error o parcialidad al así hacerlo, por lo que le otorgamos la debida deferencia a su apreciación de la prueba.

**IV.**

Por los fundamentos que anteceden, confirmamos la *"Sentencia"* apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones